2003 WY 22

SINCLAIR OIL CORPORATION,
Appellant (Petitioner),

v.

WYOMING PUBLIC SERVICE COMMIS-
SION and Steve Ellenbecker and Kristen
N. Lee, in their official capacities as
Commissioners, Appellees (Respon-
dents),

and

Amoco Pipeline Company and Citation
Oil and Gas Corporation, Appellees
(Applicant and Intervenor Below).

No. 01–228.

Supreme Court of Wyoming.

Feb. 21, 2003.

John A. Sundahl and Brian J. Hanify of Sundahl, Powers, Kapp & Martin, Cheyenne, WY, Representing Appellant. Argument by Mr. Sundahl.

Hoke MacMillan, Attorney General; Michael L. Hubbard, Deputy Attorney General; Harry D. Ivey, Assistant Attorney General; and Nancy E. Vehr, Assistant Attorney General, Representing Appellee Wyoming Public Service Commission. Argument by Mr. Ivey.

Roger C. Fransen and Ian D. Shaw of Hickey, Mackey, Evans & Walker, Cheyenne, WY, Representing Appellee Amoco Pipeline Company. Argument by Mr. Fransen.

Alvin Wiederspahn of Wiederspahn & Reese, P.C., Cheyenne, WY, Representing Appellee Citation Oil & Gas Corp. Argument by Mr. Wiederspahn.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] Sinclair Oil Corporation (Sinclair) appeals an order entered by appellee Wyoming Public Service Commission (PSC). After administrative hearing, PSC approved the application of appellee Amoco Pipeline Company (Amoco) seeking authority to abandon its crude oil gathering facilities known as the Little Buffalo Gathering System and to eliminate Little Buffalo Station as a point of origin. Upon our appellate review, we affirm.

## ISSUES

[¶ 2] Numerous issues are presented to this court on appeal. Sinclair sets forth the following issues:

1. Is it in accordance with the law for a public utility common carrier to fail to maintain its facilities, then abandon the facilities because they are in disrepair?

2. Did the PSC fail to apply the correct legal standard applicable to abandonments, and was the PSC's determination that Amoco had upheld its evidentiary burden to abandon its facilities supported by substantial evidence?

3. Did the PSC abuse its discretion by failing to apply its own regulations regarding Amoco's unilateral abandonment of the Little Buffalo Basin without prior PSC approval?

4. Was the PSC's determination regarding the public interest supported by substantial evidence, or did the PSC abuse its discretion by limiting the scope of the hearing and precluding the receipt of relevant, admissible evidence regarding the public interest?

5. Did the PSC fail to apply the correct rule of law by refusing to determine whether Citation would operate the abandoned facilities as a public utility without the required certificate of public convenience and necessity?

PSC phrases the issues on appeal as:

1. Whether the PSC followed its own rules and other pertinent law in considering and deciding the issues of this case.

2. Whether substantial evidence exists to support the PSC's factual findings when the evidence is viewed as a whole.

3. Whether the PSC's procedural rulings were in accordance with law.

---

* Chief Justice at time of oral argument.

4. Whether the issue of Citation's status as a public utility was properly before the PSC.

5. Whether the issue of late-filed exhibits was first raised on appeal.

Amoco states the issues before this court as:

1. Does Sinclair have standing to pursue this appeal?

2. Was the [PSC's] decision to grant Amoco's application to abandon made using the proper legal standards and supported by substantial evidence?

3. Was Amoco's attempt to prevent an environmental catastrophe by suspending shipments on its gathering system a basis for the [PSC] to deny Amoco's application to abandon?

4. Did the [PSC's] evidentiary decisions constitute a clear abuse of discretion and, if so, were they prejudicial to Sinclair?

Finally, appellee Citation Oil and Gas Corporation (Citation) enunciates its issues on appeal as:

1. Does Sinclair have standing under the Administrative Procedure Act to bring this appeal?

2. Was the decision of the [PSC] to grant the application of Amoco Pipeline to abandon the Little Buffalo Basin crude oil gathering facilities and to eliminate Little Buffalo Station as a point of origin on Amoco Pipeline's system in conformance with statutory requirements?

3. Did the [PSC] render a proper weighing and balancing of the affected interests impacted by the abandonment such that the public interest was best served by the abandonment of the Little Buffalo Basin gathering facilities?

4. Is the issue of whether Citation, by virtue of acquiring ownership and commencing operation of the abandoned Little Buffalo Basin gathering system, is a public utility properly before this Court? or, in the alternative, does Citation's operation of the abandoned gathering facilities render Citation a public utility?

**FACTS AND BACKGROUND**

[¶ 3] On August 30, 2000, Amoco filed an application with PSC seeking authority to abandon its crude oil gathering facilities known as Little Buffalo Gathering System and to eliminate Little Buffalo Station as a point of origin. Both Sinclair and Citation were allowed by PSC to intervene and originally opposed Amoco's application.

[¶ 4] On November 16, 2000, Amoco informed PSC operations at the Little Buffalo Gathering System had been suspended for reasons of environmental safety effective October 1, 2000, because a storage tank within the system was in substantial disrepair. On December 14, 2000, Amoco and Citation entered into a stipulated settlement agreement. Sinclair was not a party to this settlement. In the settlement agreement, Amoco and Citation agreed that should Amoco's abandonment application be granted by PSC, Amoco would sell the Little Buffalo Gathering System to Citation. Citation would then have the opportunity to connect to a pipeline other than at Little Buffalo Station on Amoco's Big Horn trunk line (presumably Marathon Oil Company's Red Butte Pipeline) in order to transport the Little Buffalo production and avoid trucking this product for refinement. Amoco and Citation further agreed that crude oil would never be sent through Little Buffalo Station on Amoco's Big Horn trunk line.[1]

[¶ 5] A public hearing was commenced on December 15, 2000, before PSC. This hearing was ultimately continued and concluded on January 3, 2001. At hearing, Sinclair objected to the terms of the stipulated settlement agreement between Amoco and Citation. PSC issued its final order June 11, 2001. This final order found 1) the gathering lines in the Little Buffalo Gathering System were sufficiently safe and in adequate condition to provide crude oil gathering services, 2) the storage tank used within the system needed to be replaced, 3) Amoco had sufficiently supported its assertion that replacement of

---

1. Although the Red Butte Pipeline provides a connection to Sinclair's refinery located in Sinclair, Wyoming, it does not connect to Sinclair's Casper refinery. Amoco's Big Horn trunk line through Little Buffalo Station provides access to crude oil to both Sinclair's refineries located in Sinclair and Casper, Wyoming.

the storage tank was not economically feasible, and 4) upon consideration of the public interests, Amoco's application should be granted. After entry of PSC's decision, Citation acquired the Little Buffalo Gathering System and negotiated an interconnect agreement with Marathon Oil Company's Red Butte Pipeline to transport to market the crude oil produced at the Little Buffalo Basin field. Sinclair appealed the decision of PSC to the district court. This matter was then certified for review by this court.

## STANDARD OF REVIEW

[¶ 6] Our review of administrative decisions is guided by the standards set forth in Wyo. Stat. Ann. § 16–3–114(c):

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity; ·

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

See *Newman v. State ex rel. Workers' Safety & Compensation Div.*, 2002 WY 91, ¶ 9, 49 P.3d 163, ¶ 9 (Wyo.2002) and *McTiernan v.*

*Scott,* 2001 WY 87, ¶ 11, 31 P.3d 749, ¶ 11 (Wyo.2001).

[¶ 7] We further enunciated in *Powder River Coal Co. v. State Bd. of Equalization*, 2002 WY 5, ¶ 5, 38 P.3d 423, ¶ 5 (Wyo. 2002):

When we review cases certified pursuant to W.R.A.P. 12.09(b), we apply the appellate standards which are applicable to the court of the first instance. *State by and through Wyoming Department of Revenue v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 5, 18 P.3d 1182, ¶ 5 (Wyo.2001); *see also Union Telephone Company, Inc. v. Wyoming Public Service Commission*, 907 P.2d 340, 341–42 (Wyo.1995). Judicial review of administrative decisions is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001). *Buggy Bath Unlimited, Inc.*, ¶ 5; W.R.A.P. 12.09(a); *Everheart v. S & L Industrial*, 957 P.2d 847, 851 (Wyo.1998).

In addition, in *Powder River Coal Co.*, at ¶ 6 (citing *Chevron U.S.A., Inc. v. State*, 918 P.2d 980, 983 (Wyo.1996) and *State by and through Dep't of Rev. v. Buggy Bath Unlimited, Inc.*, 2001 WY 27, ¶ 6, 18 P.3d 1182, ¶ 6 (Wyo.2001)), we noted when this court reviews questions of law posed in an administrative context, this court must conduct a de novo review. We affirm an agency's conclusions of law when they are in accordance with the law. However, when the agency has failed to properly invoke and apply the correct rule of law, we correct the agency's error. *Id.* See also *State ex rel. Workers' Safety & Compensation Div. v. Garl*, 2001 WY 59, ¶¶ 8–9, 26 P.3d 1029, ¶¶ 8–9 (Wyo. 2001).

[¶ 8] When issues are presented to us concerning whether there exists substantial evidence in the record to support the administrative decision, we have described substantial evidence as: "relevant evidence which a reasonable mind might accept in support of the conclusions of the agency." *McTiernan v. Scott,* at ¶ 11.

The substantial evidence standard also requires that there be more than a scintilla of evidence. It is not required that the proof attain such a degree of certain-

ty as to support only one conclusion to the exclusion of all others. Once the measure of evidence has surpassed the scintilla threshold, the possibility of drawing two inconsistent conclusions from the entire record does not mean that the conclusion drawn by the administrative agency is not supported by substantial evidence. Even where this court, after reviewing the record, arrives at a different conclusion, the court cannot substitute its judgment for that of the agency's as long as the agency's conclusion is supported by substantial evidence.

*Joe Johnson Company v. Wyoming State Board of Control,* 857 P.2d 312, 314–15 (Wyo.1993) (quoting *Department of Employment, Labor Standards Division v. Roberts Construction Company,* 841 P.2d 854, 857 (Wyo.1992)). "For evidence to be sufficient to allow a 'reasonable mind' to accept an agency's conclusion, there must appear in the record evidence which allows either a definitive conclusion or a reasonable extrapolation based on the surrounding circumstances." *GID v. Wyoming State Board of Control,* 926 P.2d 943, 951 (Wyo.1996).

*Id.* Therefore, when this court is charged with reviewing an agency's decision for substantial evidence pursuant to Wyo. Stat. Ann. § 16–3–114(c)(ii)(E),

[t]hat duty requires a review of the entire record to determine if there is relevant evidence that a reasonable mind might accept in support of the agency's decision. *Joe Johnson Company,* 857 P.2d at 314–15. Occasionally, the process of review will necessarily require the reviewing court to engage in an assessment of the facts adduced during the administrative hearing. That assessment does not usually involve a reweighing or reconsideration of the basic facts found by the agency. However, as a by-product of that process, the reviewing court may arrive at an ultimate conclusion derived from those basic facts that is different from the agency's. A court will reach a different conclusion based on the evidence only in those situations where the agency's conclusion is clearly contrary to the weight of the evidence.

*McTiernan,* at ¶ 16 (footnote omitted). We have further stated in *Newman,* at ¶ 12 (quoting *State ex rel. Workers' Safety & Compensation Div. v. Jensen,* 2001 WY 51, ¶ 10, 24 P.3d 1133, ¶ 10 (Wyo.2001)) that the substantial evidence test to be applied is as follows:

In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

■ [¶ 9] Speaking specifically of PSC, we have said that PSC is required to give paramount consideration to the public interest in exercising its statutory powers to regulate and supervise public utilities. The desires of the utility are secondary. *Tri County Telephone Ass'n, Inc. v. Public Serv. Comm'n,* 11 P.3d 938, 941 (Wyo.2000) (citing *Mountain Fuel Supply Co. v. Public Serv. Comm'n,* 662 P.2d 878, 883 (Wyo.1983)). Additionally, in recognition of the limited nature of our review, we have explained that the judicial function is exhausted when we can find from the evidence a rational view for the conclusions of the PSC. *Tri County Telephone Ass'n,* at 941 (citing *Telstar Communications, Inc. v. Rule Radiophone Serv., Inc.,* 621 P.2d 241, 246 (Wyo.1980)).

## DISCUSSION

### Standing

[¶ 10] Both Amoco and Citation assert Sinclair lacks standing to pursue this appeal because Sinclair cannot show that it is "aggrieved or adversely affected in fact" or, conversely, can show that it has incurred a "perceptible, rather than a speculative harm" as a result of the decision rendered by PSC.

[¶ 11] We recently stated in *Jolley v. State Loan & Investment Board,* 2002 WY 7, ¶¶ 6–7, 38 P.3d 1073, ¶¶ 6–7 (Wyo.2002):

Standing is a legal concept designed to determine whether a party is sufficiently affected to insure that the court is presented with a justiciable controversy. *Roe v. Board of County Commissioners, Campbell County,* 997 P.2d 1021, 1022 (Wyo. 2000) (quoting *Memorial Hospital of Laramie County v. Department of Revenue and Taxation of State of Wyoming,* 770 P.2d 223, 226 (Wyo.1989) and *Washakie County School District Number One v. Herschler,* 606 P.2d 310, 316 (Wyo.1980)).

"The doctrine of standing is a jurisprudential rule of jurisdictional magnitude. At its most elementary level, the standing doctrine holds that a decision-making body should refrain from considering issues in which the litigants have little or no interest in vigorously advocating. Accordingly, the doctrine of standing focuses upon whether a litigant is properly situated to assert an issue for judicial or quasi-judicial determination. A litigant is said to have standing when he has a 'personal stake in the outcome of the controversy.' This personal stake requirement has been described in Wyoming as a 'tangible interest' at stake. The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy."

*State ex rel. Bayou Liquors, Inc. v. City of Casper,* 906 P.2d 1046, 1048 (Wyo. 1995) (quoting *Schulthess v. Carollo,* 832 P.2d 552, 556–57 (Wyo.1992) (citations omitted)).

*Roe,* 997 P.2d at 1022–23.

Judicial review of an agency action is authorized by Wyo. Stat. Ann. § 16–3–114(a) only for those persons "aggrieved or adversely affected in fact" by the challenged action.

An aggrieved or adversely affected person is one who has a legally recognizable interest in that which will be affected by the action. *Hoke v. Moyer,* 865 P.2d 624, 628 (Wyo.1993). A potential litigant must show injury or potential injury by "alleg[ing] a perceptible, rather than a speculative, harm resulting from the agency action." *Foster's, Inc. v. City of*

*Laramie,* 718 P.2d 868, 872 (Wyo.1986). " 'The interest which will sustain a right to appeal must generally be substantial, immediate, and pecuniary. A future, contingent, or merely speculative interest is ordinarily not sufficient.' " *L Slash X Cattle Company, Inc. v. Texaco, Inc.,* 623 P.2d 764, 769 (Wyo.1981) (quoting 4 Am.Jur.2d Appeal and Error § 180).

*Roe,* 997 P.2d at 1023.

[¶ 12] In *State ex rel. Bayou Liquors, Inc. v. City of Casper,* 906 P.2d 1046, 1048 (Wyo.1995), we also recognized:

The concept of "standing to sue" refers to a right to relief that goes to the existence of a personal claim for relief. *Matter of Various Water Rights in Lake DeSmet Reservoir,* 623 P.2d 764, 767 (Wyo. 1981).

... The tangible interest requirement guarantees that a litigant is sufficiently interested in a case to present a justiciable controversy. *Laramie Rivers [Co. v. Wheatland Irr. Dist.],* 708 P.2d [20,] at 27 [Wyo. 1985] (quoting *Int'l Ass'n Fire Fighters v. Civil Serv. Comm'n,* 702 P.2d 1294, 1297–98 (Wyo.1985)).

*Schulthess v. Carollo,* 832 P.2d 552, 556–57 (Wyo.1992).

[¶ 13] In *Foster's, Inc. v. City of Laramie,* 718 P.2d 868, 872–73 (Wyo.1986) (quoting from *Matter of Various Water Rights in Lake DeSmet Reservoir,* 623 P.2d 764 (Wyo.1981)), we clarified that a potential litigant must show injury or potential injury:

" 'Standing to sue' is a right to relief and goes to the existence of a personal claim for relief. It includes a legal disability, such as insanity or infancy, but it is more. It involves a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. It is closely related to the doctrine of mootness. It requires sufficient personal interest in the outcome of litigation by way of injury or potential injury to warrant consideration by the court." 623 P.2d at 767.

To establish the requisite injury, a petitioner must allege a perceptible, rather

than a speculative, harm resulting from the agency action:

> "[A] party is not considered 'aggrieved' when there is only a remote possibility of injury."
>
> . . .
>
> "'[P]leadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action....' *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973)." (Citation omitted.) 623 P.2d at 769.

[¶ 14] Amoco and Citation profess the record reflects Sinclair does not have the type of substantial, immediate, and pecuniary interests required to support Sinclair's standing to appeal. In particular, they argue Sinclair acknowledged it had not purchased any production from the Little Buffalo Basin field for a three-year period prior to April of 2000 and Sinclair had not been a shipper on the Little Buffalo Basin Gathering System since September 1996. Moreover, Amoco and Citation claim that even after the decision of PSC approving the abandonment, ultimately allowing Little Buffalo crude oil to be transferred to the Red Butte Pipeline for shipment, Sinclair is still able to use Little Buffalo crude oil at its Sinclair, Wyoming refinery or, alternatively, Sinclair could effectively manage its crude oil supply by back hauling on its own pipeline or by making crude oil trades.

[¶ 15] In addition, Amoco and Citation contend the record establishes that even if Sinclair was able to utilize the entire crude oil production of Little Buffalo, which is approximately 2,200 barrels per day, this loss would not be material to Sinclair's operation which consumes approximately 80,000 barrels of crude oil every day. Further, Amoco and Citation assert their position is enforced by the fact Sinclair had never been able to obtain 2,200 barrels per day from Little Buffalo. Sinclair's most recent indirect purchase

in the second half of 2000 from Koch Oil Company amounted to only 500 barrels per day. Accordingly, Amoco and Citation aver that even if Sinclair was allowed continued access to Little Buffalo crude oil, there is no assurance Sinclair would use this crude oil as Sinclair has not historically been the low bidder for such crude oil, Sinclair has not purchased a large portion of this production, and Sinclair has only used this crude oil on a seasonal basis. Amoco and Citation further point out Sinclair has no contractual right to any of the Little Buffalo crude oil and has never offered a bid for, or purchased, Little Buffalo crude oil from Citation.

[¶ 16] Also in support of its position, Amoco and Citation cite Sinclair's admission that should it choose to do so, it can operate successfully without access to the Little Buffalo crude oil by obtaining its crude oil supply from North Dakota, Montana, Canada, and other fields in Wyoming. Further, Sinclair has not had difficulty in obtaining the crude oil that it needs for its operation over the past three years when no Little Buffalo crude oil was available, and Sinclair cannot identify any adverse economic impact arising out of the abandonment for which Amoco applied.

[¶ 17] In response to these contentions, Sinclair counters it has purchased Little Buffalo crude oil for the past 50 years and has purchased Little Buffalo crude oil from Conoco during the three years prior to April of 2000. In addition, when Sinclair bought crude oil, it shipped this crude oil on Amoco's pipelines pursuant to both a Federal Energy Regulatory Commission tariff and a PSC tariff. Sinclair also claims it has bought Little Buffalo crude oil when such oil has been available and intends to continue purchasing this crude oil, if allowed to do so.

[¶ 18] Finally, Sinclair asserts two reasons why it is aggrieved or adversely affected by the inability to have access to Little Buffalo crude oil at its Casper, Wyoming refinery. First, Little Buffalo crude oil represents a low-cost crude oil from a transportation standpoint because the cost to transport a barrel of Little Buffalo crude oil to Sinclair's Casper, Wyoming refinery is one dollar less than the cost to transport a barrel

of crude oil from Canada. Further, in response to a direct question from PSC at the hearing as to why the 500 barrels of crude oil per day that Sinclair was purchasing for its Casper, Wyoming refinery was such an important factor to Sinclair's ability to operate that refinery, Sinclair responded that a $10.00 per barrel profit margin for these 500 barrels per day amounted to a significant amount of money to Sinclair. Therefore, Sinclair argues the amount of crude oil Sinclair has purchased from Little Buffalo Basin is very significant from the standpoint of profit margins.

[¶ 19] Secondly, Sinclair argues it is aggrieved and adversely affected by the ruling of PSC because Little Buffalo crude oil is classified as Wyoming asphaltic crude oil, and its Casper, Wyoming refinery was designed to refine this type of asphaltic crude oil when making asphalt. Sinclair, on average, refines 8,000 barrels per day of this type of oil with this amount increasing to 12,000 to 14,000 barrels per day in the summer when demand for asphalt is higher. Therefore, although Sinclair has contracted for 4,700 barrels per day of production from another Wyoming asphaltic crude field, Little Buffalo crude oil is a primary source in the summer months. Further, Sinclair posits the loss of 2,200 barrels of Little Buffalo crude oil or the 500 barrels Sinclair was purchasing at the time of the abandonment is very significant when compared to the amount of Wyoming asphaltic crude oil that is refined by Sinclair.

[¶ 20] Upon our review of the record, we conclude Sinclair has appropriate standing to bring this appeal. Specifically, under the facts presented by Sinclair, we are convinced Sinclair is sufficiently affected to guarantee this court is faced with the determination of an actual justiciable controversy. Certainly, while Amoco and Citation try to minimize Sinclair's involvement, Sinclair is properly situated with sufficient pecuniary, personal, and tangible interests at stake. Such involvement assures Sinclair is properly motivated to vigorously advocate its position.

Sinclair has also shown potential injury or harm is readily perceptible resulting from the action taken by PSC, rather than merely speculative as argued by Amoco and Citation. As such, Sinclair is entitled to judicial review of the issues it has raised before this court.

### The PSC Determination

[¶ 21] Sinclair raises numerous issues regarding the determination by PSC to approve the application of Amoco to abandon its crude oil gathering facilities. After boiling down the issues raised by Sinclair, Sinclair essentially asserts 1) PSC erred as a matter of law in failing to apply the proper legal standard applicable in an abandonment matter; 2) PSC's determination the abandonment was in the public interest was unsupported by substantial evidence; and 3) PSC erred as a matter of law concerning Amoco's duty to maintain its facilities. We address each of these issues in turn.

### 1. Legal Standard

[¶ 22] Sinclair declares PSC applied an improper legal standard in determining the application for abandonment filed by Amoco.[2] Therefore, Sinclair concludes PSC's approval of the abandonment must be set aside. Ironically, Sinclair agrees, along with the remaining parties and this court, the proper legal standard to be applied in abandonment cases is expressed in the case of *Union Pacific Railroad Co. v. Public Serv. Comm'n,* 518 P.2d 23, 24–25 (Wyo.1974). In that case, this court stated:

> The appellant strenuously argues that the profitability of the station is not a governing or major factor to be considered but is only one of some seven mentioned as important: (1) the volume and nature of the business transacted at the station; (2) the cost of furnishing such service; (3) the ratio of the cost of maintaining the station agency (including both out-of-pocket and overall expense) to revenues received from the station; (4) the nature of the transpor-

2. Coupled with this issue, Sinclair also argues PSC's analysis incorrectly focused on unsupported economic figures, and Amoco failed to meet its burden of demonstrating that no return could be reasonably expected from its investment in a

new tank. These arguments will be addressed subsequently by this court upon its consideration of whether or not substantial evidence supported PSC's determination.

tation service remaining or to be substituted; (5) the proximity and accessibility, including public telephone service, to other stations; (6) the inconvenience to the entire shipping and traveling public and not merely to an individual or a few shippers resulting from removal of the agent; and (7) the probabilities of future development.

While it is true that the profitability aspect, covered indirectly in the first three mentioned factors, is not controlling but merely one element to be viewed along with various others, we think that, reasonably interpreted, the commission's findings so indicate; and it would seem that the commission considered profitability as only one of three factors on which the order was based.

Doubtless there is validity in each of the seven factors indicated by appellant to be of importance in determining whether or not a railroad agency should be maintained or discontinued. However, the matter varies as to existing situations. Our research leads us to believe that for practical purposes the correct rule is that if the public good, its convenience and necessity, outweighs the expense of the railroad in continuing such agency the commission is justified in denying the request for closing. *Erie–Lackawanna Railroad Company v. Pennsylvania Public Utility Commission,* 202 Pa.Super. 511, 515, 198 A.2d 383, 385; *Louisiana and Arkansas Railway Company v. Arkansas Commerce Commission,* 235 Ark. 506, 360 S.W.2d 763, 764; 74 C.J.S. Railroads § 402(2).

. . . Accordingly, the paramount question before us is whether or not the public convenience and necessity require that the agency station remain at Burns; and it is basic that the burden of proving lack is upon the carrier seeking discontinuance of the agency. *Application of Chicago & North Western Railway Company,* 79 Wyo. 343, 334 P.2d 519, 521.

In the companion case to *Union Pacific Railroad Co. v. Public Serv. Comm'n,* 518 P.2d 23, *Union Pacific Railroad Co. v. Public Serv. Comm'n,* 518 P.2d 17, 18–19 (Wyo. 1974), this court further recognized:

In that connection, it is argued, inter alia, that the basic concept, or factor, to be kept in mind in determining whether an agency station should be closed or kept open is the public convenience and necessity, that the courts have held the public convenience and necessity to be considered in granting or denying an application to close an agency station mean the convenience and necessity of the public and not of an individual or individuals, and that in the absence of public convenience and necessity the maintenance of a railroad agency station primarily involves a question of business policy with which regulatory bodies should not interfere.

. . .

Considering the burden of the carrier to prove the lack of the public's necessity and convenience in order to justify the closing of the station, we conclude that the district court was correct in affirming the commission's order.

More recently, this court again certified this is the proper legal standard that must be applied in abandonment cases in *Burlington Northern Railroad Co. v. Public Serv. Comm'n,* 698 P.2d 1135 (Wyo.1985).

[¶ 23] Sinclair further asks this court to adopt purported additional standards of review as expressed in 1 David J. Muchow & William A. Mogel, *Energy Law and Transactions* § 2.01[2][b][i] (2002) and 73B C.J.S., *Public Utilities* § 9(a) (1983). 1 *Energy Law and Transactions* § 2.01[2][b][i] espouses a rule of law that: "A utility may request to abandon services when consumer demand diminishes and the costs of providing service increase so that it is no longer profitable for the utility to continue providing service." The standard set forth in 73B C.J.S., *Public Utilities* § 9(a) states:

The devotion of property to a public use carries with it the duty to serve the public, and such duty must be performed by a public utility or its privileges and franchise must be surrendered. As a general rule, it has no right to discontinue or abandon its service on any part of its property devoted to public use or to impair its ability to perform its public duties except with the consent of the state; and the mere fact

that the enterprise or a particular service is not profitable does not justify the utility in ceasing or refusing to perform its duties.

In the absence of a statute or contract, however, a utility is not bound to continue operation at a loss if there is no reasonable prospect of profitable operation in the future, or if such continuance will require a considerable investment from which no return can reasonably be expected.

(Footnotes omitted.) This section goes on to express a state may compel performance of the public utility's duties when no adequate excuse for nonperformance is shown.

[¶ 24] Initially, upon our consideration of the standards which Sinclair asks us to adopt, we recognize Sinclair admits the standard set forth in C.J.S. is substantially similar to the standard set forth for railroads already adopted in our holdings in both *Union Pacific Railroad Co. v. Public Serv. Comm'n*, 518 P.2d 23 and *Union Pacific Railroad Co. v. Public Serv. Comm'n*, 518 P.2d 17, 18–19 and confirmed in *Burlington Northern Railroad Co. v. Public Serv. Comm'n*, 698 P.2d 1135. In addition, the standard set forth in 1 *Energy Law and Transactions* § 2.01[2][b][i], in essence, enumerates only one element which our already adopted standard expresses through these holdings. Hence, we refuse to adopt those standards proffered by Sinclair because we find them to be too limiting. Rather, we find the better rule of law to be that already expressed in Wyoming which requires a more global review and balancing of each of those factors as set forth in *Union Pacific Railroad Co. v. Public Serv. Comm'n*, 518 P.2d 23, 24–25 and the subsequent opinions issued by this court.

[¶ 25] Upon our review of the record, we hold PSC applied the appropriate legal standard with respect to the abandonment application of Amoco. In its decision PSC stated:

84. In making a determination as to whether to grant the abandonment of public utility facilities and the cessation of public utility service the Commission must be guided by public interest considerations. In this present case, the public interest was identified as consisting of the interests of the lease and royalty holders in the Little Buffalo Field, including the State of Wyoming through the Office of State Lands and Investments; Citation, as the producer and marketer of production in the field; Sinclair, as a prior purchaser of production from the Little Buffalo Basin Field; and Amoco, as the owner of the gathering facilities proposed to be abandoned. The Commission notes that, although Koch Oil Company and Conoco have been identified as prior purchasers of Little Buffalo Basin crude oil, neither entity expressed any position regarding the proposed abandonment. In weighing and balancing the common, and in some instances the conflicting, interests of these various entities it is important to consider their past utilization of these public utility gathering facilities and the future impact on these entities should the abandonment be granted.

PSC also found, through evidence comprised of actual operating results for the most recent three-year period, Amoco had supported its assertion that replacement of the storage tank was not economically feasible. However, PSC specifically noted this issue was not the primary consideration or factor upon which it relied in making its final decision.

[¶ 26] PSC recognized Citation was responsible for marketing all of the oil produced in Little Buffalo Basin on behalf of its limited partners, as well as the remaining leaseholders that retained the remaining 2% of the working interest in the leasehold. In addition, PSC observed Citation's purchase and operation of the gathering line facilities and its agreement not to utilize the Little Buffalo Basin point of origin giving access to the Amoco Big Horn trunk line provided Citation with a greater number of possible markets and potentially better sales prices for the Little Buffalo Basin production, to the greater benefit of Citation and the lease and royalty holders in the field. Finally, PSC acknowledged Sinclair had not purchased any of the production from the Little Buffalo field for the three-year period prior to April of 2000 and, only recently toward the second half of 2000, had an opportunity to purchase

some of this crude oil from Koch Oil Company.

[¶ 27] Therefore, we conclude PSC applied the appropriate legal standard as originally set forth in the seminal case of *Union Pacific Railroad Co. v. Public Serv. Comm'n*, 518 P.2d 23 and properly considered the public good, convenience, and necessity with respect to its determination concerning the abandonment application of Amoco. Indeed, the record reflects PSC took a very deliberate, conscientious, and systematic approach in its analysis to ensure its determination was appropriately based upon the specific criteria previously enumerated by this court.

### 2. Substantial Evidence

[¶ 28] Along with its numerous complaints that PSC applied the incorrect legal standard in determining the application for abandonment filed by Amoco, Sinclair through a "shot-gun" approach argues PSC's determination was not supported by substantial evidence. In taking such an approach, Sinclair merely cites this court to its own facts and arguments presented at the PSC hearing and performs little analysis detailing why PSC's determination was unsupported by the evidence garnered at hearing. In fact, we are inclined to agree with the characterization of each of the appellees that Sinclair simply attempts to re-try its case before this court, rather than present this court with foundation that PSC's ultimate conclusion was not supported by substantial evidence.

[¶ 29] Initially, Sinclair claims PSC's conclusions that a new storage tank would cost $691,000 and replacement of the storage tank was not economically supported were erroneous and not supported by evidence presented at hearing. Certainly, as admitted by PSC in its final order, these issues were each highly contested. Nevertheless, sufficient evidence was submitted to PSC to support its ultimate determination.

[¶ 30] Amoco, Sinclair, and Citation presented evidence at the hearing concerning the estimated costs associated with the replacement of the subject tank. Amoco's wit-

ness, Tom Boslett, district manager for the Rocky Mountain Business District of Amoco, testified the cost of the tank, itself, along with any related material and assembly costs, constituted only a portion of the total cost in replacing the tank and other costs such as foundation work, dirt work, electrical work, and site preparation among other possible costs needed to be factored into the cost of replacement of the tank. At the hearing, Sinclair pointed out Citation, in responding to discovery, estimated the cost of erecting a storage tank was $200,000, yet it is unclear whether this estimate included all costs associated with the total endeavor of replacing the tank. In fact, Citation went on to indicate it had expended considerable time, effort, and expense in designing and obtaining cost estimates to install a new gathering system at Little Buffalo Basin. However, it remains questionable if these costs are included in the $200,000 storage tank figure. Sinclair also provided PSC with bid estimates for replacement of the tank which varied from $103,000 to $130,000.[3] Nevertheless, Sinclair admitted these estimates only included the cost for materials and labor to install the tank shell and did not include other costs which would also have to be incurred in replacing the tank, such as site preparation costs, earthwork, foundation for the tank, floating roof, electrical instrumentation, valves, piping, tank coatings, engineering design, construction management, and inspection. Accordingly, comparison of the cost estimates received by PSC to replace the tank becomes virtually impossible.

[¶ 31] Sinclair also criticizes PSC for allegedly not requiring Amoco to meet its burden of proof with respect to the economic realities associated with its proffered abandonment. Review of the record indicates Amoco presented actual operating results for a three-year period and estimated costs for replacement of the tank in support of its argument that replacement of the tank would not be economically feasible. Sinclair argues Mr. Boslett, on behalf of Amoco, admitted there existed no foundation for this documentation and, therefore, PSC relied on data that was admittedly unsupported to reach its con-

---

**3.** Some of this evidence was presented to PSC via post-hearing documentation filed by Sinclair.

clusion. A more careful review of Mr. Boslett's testimony reveals the operating results presented constituted accurate figures available to Amoco regarding net revenues for the applicable period of time. Critically, Mr. Boslett testified Amoco's analysis was primarily supported by the actual operating revenue and expenses incurred. In addition, Mr. Boslett testified on numerous occasions upon rigorous cross-examination by Sinclair's counsel that the economic analysis performed by Amoco concerning its calculated rate of return was a rough estimate, however, even substantial changes in the numbers utilized would not significantly change the outcome.

[¶ 32] Sinclair also argues Amoco must demonstrate no return can be reasonably expected from the investment in the new tank and therefore, because Amoco submitted evidence that a return of at least 5.5% might be realized, PSC erred in making its determination. This assertion by Sinclair as to Amoco's required burden of proof is patently incorrect. As noted above, the proper legal standard that must be applied requires seven distinct factors to be considered with the primary consideration ultimately being public good, convenience, and necessity. The established law in Wyoming simply does not require Amoco to demonstrate absolutely no return can be reasonably expected from any anticipated investment in the system.

[¶ 33] Further, Sinclair asserts PSC's conclusion that approving the requested abandonment was in the public's best interest is unsupported by substantial evidence. As foundation for this contention, Sinclair again avers that it was significantly adversely affected by the decision of PSC given the positioning of Sinclair in the market as previously set forth in our discussion regarding standing. Primarily, Sinclair argues under the allowed abandonment it is now unable to easily obtain crude oil for its Sinclair, Wyoming refinery. Sinclair also takes the position that Citation's interests in the requested abandonment are insignificant because the determination of PSC, one way or another, did not affect Citation's ability to market its product.

[¶ 34] The record evidences PSC's painstaking analysis of all interests affected in this case. In particular, PSC assessed the potential effects of its determination on each of the lease and royalty holders in the Little Buffalo field, including the United States government; the State of Wyoming; Citation, as the producer and marketer of the oil produced; Amoco, as the owner of the facilities proposed to be abandoned; and Sinclair, as a previous and recent purchaser of oil. In addition, PSC gave notice to prior purchasers of oil such as Koch Oil Company and Conoco, but these entities chose not to participate in this matter. Finally, PSC considered the effects its decision might have on the public at large.

[¶ 35] The evidence establishes Citation is the sole operator of the Little Buffalo field and with its limited partners owns over 98% of the working interests in the Little Buffalo leasehold estate. In addition, no owners or operators other than Citation transport crude oil through the gathering system, and Citation is exclusively responsible for the marketing of crude oil produced at Little Buffalo Basin on behalf of its limited partners and the owners of the other 2% of the working interests. Therefore, Citation clearly possessed a direct and substantial interest in the Little Buffalo field.

[¶ 36] Citation further showed that its purchase and operation of the gathering facilities and its agreement to not ship through Amoco's Big Horn trunk line provided Citation with access to a greater number of markets and a potential for better sales prices. These consequences obviously enure to benefit, not only Citation, its limited partners, the remaining working interest owners, but potential purchasers and governmental interests, as well as the public at large. In addition, it is logical for Citation to own and operate the gathering system thereby ensuring Citation is committed to the fullest possible continued development of Little Buffalo Basin resources.

[¶ 37] Furthermore, PSC considered Sinclair's involvement as a crude oil purchaser. The evidence presented established Sinclair had not purchased crude oil produced at Little Buffalo Basin for the three-year period prior to April of 2000; Sinclair purchased

only a small amount of crude oil from Koch Oil Company since that time; Sinclair had not been a shipper on the gathering system since 1996; Sinclair had other sources for obtaining crude oil in North Dakota, Montana, Canada, and other fields in Wyoming; Sinclair had never offered to bid for, or purchased, Little Buffalo crude oil from Citation; and Sinclair had no existing contractual right to purchase Little Buffalo Basin crude oil. Finally, PSC recognized, even upon approval of the abandonment of Amoco facilities and utilization of the Red Butte Pipeline as contemplated by Citation, Sinclair could still receive Little Buffalo Basin crude oil at its Sinclair, Wyoming facilities.

[¶ 38] We readily admit the record before us does reflect some evidence that is contrary to the ultimate decision made by PSC. However, this evidence is not sufficient to convince us the determination of PSC was incorrect. We, therefore, determine the findings and rulings reached by PSC were based on substantial evidence and within established law. We hold the record provides a rational basis for PSC's ultimate findings of fact and conclusions of law. As such, we hold these findings of fact and conclusions of law were not clearly contrary to the overwhelming weight of the evidence. Further, we recognize, as we have on numerous other occasions, that we will not substitute our judgment for that of an agency when substantial evidence supports the decision rendered by the agency involved. *Elk Horn Ranch, Inc. v. Board of County Comm'rs*, 2002 WY 167, ¶ 13, 57 P.3d 1218, ¶ 13 (Wyo. 2002) (citing *Newman v. State ex rel. Workers' Safety & Compensation Div.*, 2002 WY 91, ¶ 12, 49 P.3d 163, ¶ 12 (Wyo.2002)).

[¶ 39] In tangentially related assertions to Sinclair's sufficiency of the evidence argument, Sinclair further repines PSC improperly refused to allow Sinclair to inquire additionally into the public interest issues by making evidentiary rulings against Sinclair and through PSC's request for and acceptance of late filed exhibits after the hearing was concluded. Sinclair also contends PSC erred when it refused to allow Sinclair to admit Citation's pre-filed testimony of Forrest Harrell.

[¶ 40] With respect to PSC's evidentiary rulings, Sinclair asserts it was improperly prevented from completely delving into the effects of the settlement agreement reached between Amoco and Citation with respect to issues regarding alternative transportation of the crude oil and the existence and sufficiency of those markets available under the terms of the agreement. Furthermore, Sinclair proffers it was unfair for it to be averted from inquiring into these areas while at the same time Amoco and Citation were allowed to utilize the terms of the settlement agreement entered into between them to support Amoco's requested abandonment.

[¶ 41] It is well established in Wyoming that with regard to an agency's decision on the admission or exclusion of evidence and testimony, such is left within the sound discretion of the agency. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *In re: Worker's Compensation Claim of Shryack*, 3 P.3d 850, 855 (Wyo.2000) (quoting *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998)). An abuse of discretion has also been said to have occurred only when the decision shocks the conscience of the court and appears to be so unfair and inequitable that a reasonable person could not abide it. *Hall v. Hall*, 2002 WY 30, ¶ 12, 40 P.3d 1228, ¶ 12 (Wyo.2002); *Everheart v. S & L Industrial*, 957 P.2d 847, 853 (Wyo.1998); *Goddard v. Colonel Bozeman's Restaurant*, 914 P.2d 1233, 1238 (Wyo. 1996).

[¶ 42] PSC limited Sinclair's inquiry into the effects of the settlement agreement reached between Amoco and Citation with respect to those issues regarding alternative transportation of the crude oil and the existence or sufficiency of those markets available under those terms based primarily upon its determination that PSC should not inquire into and make decisions concerning private entities over which the PSC had no control. This court has previously cautioned PSC that it is not authorized to meddle in the

private sector's contractual affairs. *Union Telephone Co., Inc. v. Public Serv. Comm'n,* 910 P.2d 1362, 1365 (Wyo.1996).

[¶ 43]   Furthermore, PSC allowed Sinclair some latitude with these subjects yet drew the line at Sinclair's attempt to obtain specific details in these areas.   Moreover, we recognize the terms of the agreement between Amoco and Citation were fully disclosed to PSC; and testimony from a Citation witness, Gary C. Johnson, was received by PSC regarding these topics.   Indeed, in its determination, PSC explicitly observed that under the agreement Citation had agreed not to transport crude oil via Amoco's Big Horn trunk line, which would result in Sinclair being precluded from direct access to Little Buffalo field crude oil at its Casper, Wyoming refinery.   PSC further properly intimated Sinclair's intended inquiry into these areas was cumulative and, in any event, outside the direct abandonment application being considered at the hearing.   Finally, Sinclair had the opportunity at the hearing to present its own evidence and testimony into these areas without directly attempting to elicit Citation's particular business plans given its agreement with Amoco, but chose not to do so.   We hold, therefore, PSC did not abuse its discretion when it precluded detailed inquiry into the specific manner in which Citation intended to transport crude oil given its decision to enter into the agreement with Amoco.

[¶ 44]   As to Sinclair's asserted error concerning PSC's acceptance of exhibits from the parties after hearing, we reach a similar result.   First, Sinclair did not object to Citation's submission of evidence as requested by PSC and, therefore, impliedly waived any issue regarding these exhibits. Under long standing precedent, this court has also clearly established it will not consider those issues on appeal not previously raised.   *State v. Campbell County Sch. Dist.,* 2001 WY 90, ¶ 35, 32 P.3d 325, ¶ 35 (Wyo.2001); *Cooper v. Town of Pinedale,* 1 P.3d 1197, 1208 (Wyo.2000); *R.O. Corp. v. John H. Bell Iron Mountain Ranch Co.,* 781 P.2d 910, 913 (Wyo.1989).   Secondly, Sinclair was also allowed by PSC to submit exhibits after hearing and even requested that certain information contained within the late-filed exhibits be submitted by the parties. Therefore, it is disingenuous for Sinclair to complain Citation was given this same opportunity and now object after its own requests have been satisfied.

[¶ 45]   We also find the exhibits submitted by Citation were somewhat cumulative to the testimony given by its witness, Mr. Johnson, concerning the areas of alternative transportation of the crude oil and the existence or sufficiency of those markets available.   Finally, we believe that the request for and acceptance of the late-filed exhibits by PSC was done in order to obtain all the necessary information needed by PSC to make a complete and informed determination in this matter and was appropriate in such regard. *See Majority of Working Interest Owners In Buck Draw Field Area v. Wyoming Oil & Gas Conservation Comm'n,* 721 P.2d 1070, 1078 (Wyo.1986) (holding an administrative agency may admit documentary evidence in a contested case after hearing).

[¶ 46]   Lastly, Sinclair grieves that PSC improperly deterred it from admitting the pre-filed testimony of Mr. Harrell, Citation's witness.   However, upon our review, we find that this testimony was summative to live testimony given by Citation's witness, Mr. Johnson.   Additionally, Sinclair was granted leeway in its cross-examination of Mr. Johnson to explore the areas expressed by Mr. Harrell prior to hearing.   Further, Sinclair did not subpoena Mr. Harrell to testify at hearing.   Therefore, we find that PSC again did not abuse its discretion in rendering its decision and, in any event, PSC's ruling proved harmless to Sinclair.

### 3.   *Duty to Maintain*

[¶ 47]   Sinclair also contends Amoco had a duty to maintain its facilities as a public utility under both statutory and regulatory authority and PSC failed to make a determination regarding this issue.   Moreover, Sinclair contests it was improper for PSC to grant Amoco's abandonment application predicated on Amoco's contention the subject storage tank was in a dilapidated condition.

[¶ 48] Initially, this court recognizes that PSC did make a review as to whether there existed a connection between what had previously transpired leading up to the deterioration of the system and the proposed abandonment sought by Amoco. This was expressly detailed by PSC at the hearing. Furthermore, the evidence presented at the hearing showed that the only unusable portion of the facilities was the 55-year-old storage tank. Indeed, at the hearing Citation admitted that it intended to continue to use the facilities with the exception of the storage tank. This fact was expressly detailed by PSC in its order: "the gathering lines serving the Little Buffalo Field remain in a sufficiently safe and adequate condition to provide crude oil gathering service."

[¶ 49] Upon our review of the record, we must also agree with the conclusions of PSC expressed in its order that:

> The evidence of record reflects the parties' concurrence that the storage tank needs to be either repaired or replaced. Although the gathering lines and the existing 10,000 barrel storage tank are not cathodically protected and are of similar vintage, the Commission concurs with the opinions expressed by Amoco and Citation that the current condition of the storage tank precludes its continued use. Amoco witness Boslett described the storage tank as having a crumbling foundation, serious corrosion, bowed stop parts, and being in service beyond its useful life. Mr. Boslett further testified that recent cleaning of the tank resulted in leaks.

Simply stated, the evidence presented supports the conclusion that the storage tank had reached the end of its useful life.

[¶ 50] Sinclair also challenges Amoco's efforts to maintain the storage tank and alludes that Amoco had received PSC approved higher rates in order to better service and maintain its facilities, yet failed to do so in this case. Nevertheless, the evidence presented at the hearing confirmed that Amoco had taken specific maintenance steps with respect to the storage tank over the years and had kept the storage tank in use over a substantial number of years without accident, injury, or spillage. The evidence also supported the fact that Amoco, to its credit, has and abides by an extremely stringent internal policy with respect to leaks and spills.

[¶ 51] Sinclair also contends that PSC should have reprimanded Amoco for having shut down the gathering system prior to PSC's determination regarding Amoco's application for abandonment. We hold Sinclair's argument in that regard lacks merit. As related above, on November 16, 2000, prior to hearing, Amoco informed PSC the Little Buffalo Gathering System had been suspended effective October 1, 2000, for reasons of environmental safety because a storage tank within the system was in substantial disrepair. Amoco suspended operation because cleaning the tank resulted in leaks, and Amoco was concerned that continued use of the storage tank might result in spillage. Amoco also confirmed at the hearing that should PSC rule that Amoco's requested abandonment be denied, Amoco was prepared to move forward as directed by PSC and place the storage tank again into service after making the required steps to insure the tank's safety.

[¶ 52] Further, common sense dictated the actions of Amoco in taking steps to remove the storage tank from service. Presumably, had Amoco not taken these steps and simply awaited the determination by PSC, which was ultimately rendered many months later, a realized and actual environmental catastrophe may have resulted. Finally, upon its review, PSC certainly has the authority to adequately deal with the actions of Amoco in the event PSC found them to be unsupported and not taken in good faith. *See Williston Basin Interstate Pipeline Co. v. Public Serv. Comm'n,* 996 P.2d 663, 667 (Wyo.2000).

[¶ 53] Finally, Sinclair disputes PSC's refusal to address whether Citation became a public utility when it entered into the settlement agreement with Amoco. Upon our review, we hold that this issue was not properly before PSC, as the only issue to be addressed in this proceeding was Amoco's application for abandonment. Citation's status is clearly distinct and squarely separate in nature. We also further recognize that although the issue of Citation's status as a

public utility may certainly be properly brought before PSC, it is most appropriate that this issue be addressed in a separate proceeding so as to allow the full development of the facts and to afford all parties an opportunity for an independent, fair, and equitable hearing concerning this issue.

[¶ 54] We also must point out that PSC's refusal to address or render a determination on Citation's status as a public utility did not preclude PSC from making its ultimate decision upon Amoco's abandonment application. As set forth above, we hold that PSC took a very deliberate, conscientious, and systematic approach in its analysis to ensure its determination was appropriately based upon the specific criteria previously enumerated by this court and that PSC's ultimate determination to grant Amoco's application is supported by substantial evidence.

## CONCLUSION

[¶ 55] Upon our review and analysis, we affirm the action of PSC in granting the application of Amoco seeking authority to abandon its crude oil gathering facilities known as Little Buffalo Gathering System and to eliminate Little Buffalo Station as a point of origin.