AT & T CORP. and AT & T COMMUNICATIONS OF TEXAS, L.P., Plaintiffs,

v.

The PUBLIC UTILITY COMMISSION OF TEXAS, and Rebecca Klein, Chairman, and Brett A. Perlman, Commissioner, in their official capacities as Commissioners of the Public Utility Commission of Texas, Defendants.

No. A–02–CA–658–SS.

United States District Court,
W.D. Texas,
Austin Division.

March 12, 2003.

Mark T. Witcher, AT & T, Thomas K. Anson, Strasburger & Price, LLP, Matthew William Baab, McElroy, Sullivan, Ryan & Miller, LLP, Austin, TX, for plaintiffs.

Steven Baron, Attorney General's Office, Kristen L. Worman, Texas Attorney General's Office, Natural Resources Division, Austin, TX, for defendants.

### *ORDER*

SPARKS, District Judge.

BE IT REMEMBERED on the 31st day of January 2003 the Court called for hearing the above styled-case, and specifically the Plaintiff's [# 7] and Defendant's [# 10] motions for summary judgment. Having considered the motions and responses, the arguments of counsel at the hearing, the post-hearing supplemental briefs [# 13, # 14, # 17, # 18], the applicable case law and the case file as a whole, the Court now enters the following opinion and orders.

### Background

The plaintiffs, AT & T Corp. and AT & T Communications of Texas, L.L.P. (collectively, "AT & T"), filed this suit against the Commissioners of the Public Utility Commissions of Texas (the "Commissioners") in their official capacities, seeking a declaration that Chapter 16, Section 26.420(f)(2) of the Texas Administrative Code ("the Regulation"), promulgated by the Public Utility Commission (the "PUC"), is unlawful. The Regulation requires AT & T and all other carriers to pay a percentage of their *total* taxable telecommunications receipts—including international and interstate, and not just intrastate revenues—into the Texas Universal Service Fund ("TUSF"). 16 TEX. ADMIN. CODE § 26.420(f)(2) (incorporating the definitions of taxable telecommunications receipts as defined in Chapter 151 of the Texas Tax Code). Like its federal counterpart, the TUSF is the system by which the state requires all telecommunications providers to pay into a fund, so that it can in turn provide financial aid to carriers to entice them to provide services to communities that are difficult and expensive to serve, such as rural communities. *See Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393, 405–409 (1999) (*"TOPUC"*) (providing an extensive background about the federal universal service fund).

Both parties have moved for summary judgment. Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). Because the only remaining issues are legal in nature, the case is appropriate for resolution at the summary judgment stage. AT & T challenges the Regulation on two grounds: (1) that it conflicts with federal telecommunications law, and thus, under the Supremacy Clause of the United States Constitution, is preempted, and (2) that it violates the Commerce Clause of the United States Constitution.

### Analysis

Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST., Art. VI, cl. 2. Accordingly, state law is preempted if: (1) if Congress explicitly declares the state law preempted; (2) if the state law regulates conduct "in a field that Congress intended the Federal Government to occupy exclusively"; or (3) if the state law actually conflicts with federal law. *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). AT & T argues the Regulation is problematic because the PUC has attempted to regulate a field occupied exclusively by the federal government, and be-

cause the Regulation conflicts with federal law.

The Fifth Circuit recently summarized the ways in which a state law may be in conflict with a federal law: (1) "where the state law mandates or places irresistible pressure on the subject of the regulation to violate federal law;" (2) "where compliance with both regulations is physically impossible;" (3) "where the state regulation frustrates or hectors the overall purpose of the federal scheme;" or (4) "where the federal scheme expressly authorizes an activity which the state scheme disallows." *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488, 495 (5th Cir.2003) (citations omitted). AT & T does not contend that it is impossible to pay both the Federal Universal Service Fund ("FUSF") and TUSF assessments, or that the Regulation disallows conduct expressly permitted by the federal regulations. Instead, AT & T argues the Regulation in inconsistent with and frustrates the objectives of federal telecommunications law.

Federal telecommunications law, dating back to the Communications Act of 1934, has as one of its primary objectives universal telecommunication service. *TOPUC*, 183 F.3d at 406. In tension with that objective, however, is the primary goal of the 1996 Act: opening local telephone markets to competition. *Id.* In an attempt to implement a framework that promotes both goals, the 1996 Act "directs the FCC to replace the patchwork of explicit and implicit subsidies with specific, predictable and sufficient Federal and State mechanisms to preserve and advance federal service." *Id.* (quoting 74 U.S.C. § 254(b)(5)). Another provision establishes the parameters of the states' role in promoting universal service:

A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

47 U.S.C. § 254(f). AT & T argues the Regulation conflicts with the constraints Section 254(f) explicitly imposes on the states in the following three ways: (1) it impermissibly relies on the FUSF support mechanisms; (2) it impermissibly burdens the FUSF support mechanisms; and (3) the administration of the state assessment is neither equitable nor nondiscriminatory. A federal district court in Oregon recently addressed the exact arguments AT & T advances in this case in *AT & T Communications, Inc. and AT & T Communications of the Pacific Northwest, Inc., v. Eachus*, 174 F.Supp.2d. 1119 (D.Or.2001). Although the case does not bind this Court, it is persuasive in its reasoning and importantly, its interpretation of *TOPUC*, which this Court is bound to follow.

### A. Impermissible Reliance on FUSF Mechanisms

AT & T first argues the Regulation is problematic because although Texas is permitted to "adopt additional specific, predictable, and sufficient mechanisms to support" universal service, the state definitions or standards cannot "rely on" Federal universal service support mechanisms. 47 U.S.C. § 254(f). The FCC regulations require carriers pay a portion of their

international and interstate telecommunications revenues into the federal universal service fund ("FUSF"). *See* 47 C.F.R. § 54.709(a). The Regulation operates in a nearly identical fashion, except that carriers who provide intrastate service must pay a percentage of all of their revenues—international, interstate, and intrastate—into the TUSF. 16 TEX. ADMIN. CODE § 26.420(f)(2) (incorporating the definitions in Chapter 151 of the Texas Tax Code to define taxable communications receipts). Because Texas, through the Regulation, assesses the same pool of revenue (international and interstate) as the federal government, it impermissibly "relies on" the federal mechanism. *See Eachus*, 174 F.Supp.2d at 1124 ("where [state regulations] 'depend on' the same interstate revenues utilized by the federal universal service fund program, [they] improperly rel[y] on' federal universal support mechanisms."). In coming to its conclusion, the *Eachus* court, in part, relied on the dissent in *In the Matter of Federal–State Joint Bd. on Universal Service, Second Recommended Decision*, CC Docket No. 96–45, 13 F.C.C.R. 24,774, at *24813, 1998 WL 814511 (Nov. 23, 1998) (Commissioners McClure and Schoenfelder, dissenting) (hereinafter, *"Second Recommended Decision"*). *Id.* The court justified its reliance on the dissent, in which Commissioner Schoenfelder stated that "any State USF fund making assessments on the same revenues [that the FCC assesses] would 'rely on or burden' the Federal Mechanism," on the grounds the Fifth Circuit reversed the portion of Second Recommended Decision that included intrastate revenues in calculating the carrier contributions to the FUSF, and thus implicitly adopted the dissenters' statutory analysis. *Id.* (citing *TOPUC*, 183 F.3d at 446–48). That the *Eachus* court's conclusion partially relies on the Fifth's Circuit's analysis in *TOPUC* makes the Oregon district court's decision even more persuasive to this Court.

In response, the Commissioners argue AT & T, like the *Eachus* court, misconstrues Section 254(f). The Commissioners contend the first sentence of Section 254(f) grants the states broad authority, whereas the last sentence is a limitation on state authority that only comes into play if a state establishes requirements beyond those established by the FCC. The Commissioners ·claim Texas has not imposed any *additional* universal service requirements, but the same exact requirements as the FCC: the high-cost, low-income, rural health care, and schools and libraries support programs. Therefore, argue the Commissioners, the Court need not even reach the question of whether any additional universal service requirements (which they contend are nonexistent) rely on or burden the federal universal service support mechanisms.

■ The Commissioners provide no persuasive authority for their reading of Section 254(f), in particular their limited interpretation of "additional requirements" and generous interpretation of the authority granted to the states. Generally, words in a statute are presumed to have their "ordinary, contemporary, common meeting," *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). The plain language of the statute suggests a different understanding than the Commissioners advocate. The Court sees no reason to limit its interpretation of "additional requirements" to mean the specific federal support programs (high-cost, low-income, etc.), when the statute could easily have been drafted in less generic terms. Similarly, the plain language demonstrates each time the states are granted authority by Section 254(f), their authority is explicitly restricted, not unfettered. The first sentence states, "[a] State may adopt regulations *not inconsistent*

*with the Commission's rules....*" 47 U.S.C. § 254(f) (emphasis added). The last reads, "[a] State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only *to the extent that such regulations* adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that *do not rely on or burden Federal universal service support mechanisms.*" 47 U.S.C. § 254(f) (emphasis added). The Court agrees with the Commissioners that the states were granted authority to regulate in order to promote universal service, but does not agree that they were given the broad authority to enact any measure they see fit. Even the legislative history the Commissioners cite in support of their argument emphasizes that the states' discretion must operate within the bounds of federal law. *See* Resp. & Cross–Mot. at 16 (citing H.R. CONF. REP. No. 104–458, at 132 (1996), U.S.Code Cong. & Admin.News 1996, p. 124, which reemphasizes all of the restrictions articulated in Section 254(f)).

The Commissioners further argue that in addition to misunderstanding the scope and applicability of the last sentence of § 254(f), AT & T, like the *Eachus* court, misconstrues the word "mechanism," as it is used in that sentence, to mean "revenue base." According to the Commissioners' interpretation, "mechanism" does not refer to the revenue base from which Texas derives its TUSF contributions, but instead the specific programs the FCC established to preserve and advance universal service—specifically the high cost, low-income, rural health care, and schools and libraries support programs.

To divine the "ordinary, contemporary, common meaning" of the words in a statute, *Pioneer,* 507 U.S. at 388, 113 S.Ct. 1489, federal courts frequently turn to *Webster's Dictionary. See, e.g., Fischer v.* *United States,* 529 U.S. 667, 677, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000) (relying on *Webster's* definition of "benefit" in interpreting a statute). According to *Webster's,* "mechanism" means "a process or technique for achieving a result." Assessing international and interstate service revenues (the process) in order to generate a universal service fund (the result) falls within the ordinary and common meaning of "mechanism." The Commissioners misstate ATT's position by claiming it equates "mechanism" with "revenue base." AT & T clarified in its reply they believe mechanism refers to the FUSF itself, including how money for the fund is raised and disbursed. *See* Reply at 3. The Court holds the mechanism impermissibly "relied on" by the TUSF is the FCC-established process of assessing telecommunications carriers' international and interstate revenues to generate the FUSF. The Commissioners give no compelling reason, rooted in the text or elsewhere, for the Court to reject this conventional understanding of "mechanism" for the limited interpretation they advocate.

The Commissioners also argue that because the TUSF assessment is administered, collected, and disbursed independent of the federal universal support mechanisms, and because the amount of universal service support collected and disbursed in Texas is not contingent upon the amount of money collected under the federal support mechanisms, the TUSF assessment does not "rely on" federal universal support mechanisms. The Commissioners, in making these arguments, have named two ways in which the Regulation could impermissibly rely on FUSF support mechanisms. However, they do not adequately explain why Texas's dependance on the FUSF scheme, the assessment of interstate and international revenues, to generate the TUSF does not constitute reliance on that mechanism.

On the other hand, the Court is persuaded by the *Eachus* court's conclusion that "rely on" means "depend on"—its ordinary meaning. *Eachus*, 174 F.Supp.2d at 1123–24. That the Regulation "relies on" a FUSF mechanism is further substantiated by Schoenfelder's explicit assertion, discussed above, that "any State USF fund making assessments on the same revenues [the FCC assesses] would 'rely on or burden' the Federal Mechanism." *Second Recommended Decision*, 1998 WL 814511, at *24813 (Commissioners McClure and Schoenfelder, dissenting).

## B. Impermissible Burden on FUSF Mechanisms

Although its reliance on the FUSF mechanism is enough to render the Regulation preempted, AT & T also argues the Regulation imposes an impermissible burden on FUSF mechanisms. Again, even though Texas is permitted to "adopt additional specific, predictable, and sufficient mechanisms to support" universal service, the state definitions or standards cannot "burden" federal universal service support mechanisms. 47 U.S.C. § 254(f). AT & T points out that the more interstate and international revenues the carriers generate, the bigger the contributions the carriers pay to the FUSF. AT & T persuasively argues because the Regulation assesses *all* revenue of jurisdictionally-mixed carriers (those that provide interstate, international, and intrastate service), and because after *TOPUC*, the federal government cannot assess intrastate revenues, the carriers have an incentive to provide only intrastate services and avoid what AT & T refers to as "double taxation." *Cf. TOPUC*, 183 F.3d at 447 n. 101 (reasoning that permitting the FCC to assess intrastate revenues "could certainly affect carriers' business decisions on how much intrastate service to provide or what kind it can afford to provide."); *see also Eachus*, 174 F.Supp.2d. at 1124 (holding that a

state assessment of all of the revenues of jurisdictionally-mixed carriers, including international and interstate revenues, "could indeed have an impact on a carrier's decision to provide interstate telecommunications."). This disincentive translates into lower interstate and international revenues, which results in the generation of fewer dollars for the FUSF. In other words, the Regulation imposes a burden.

■ Section 254(f) forbids any burden, as opposed to a substantial or consequential burden, on the FUSF mechanisms. 47 U.S.C. § 254(f). AT & T is not required to show that a carrier has actually stopped providing interstate or international telecommunications services as a result of the higher assessment rate on the revenues from those services, although that is what the Commissioners argue, because basic economics suggests taxing one activity more heavily than another will provide a company with *an incentive* (there are, of course, others at work) to engage in the alternative activity in lieu of the heavily-taxed activity. *See* Reply at 7 n. 6 (citing R. POSNER, ECONOMIC ANALYSIS OF LAW §§ 17.1 & 17.3 (5th ed.1998), for the proposition that taxation of a competitive business activity creates an incentive to substitute another less heavily-taxed activity). The Regulation conflicts with Section 254(f) by burdening the FUSF mechanisms and is thus preempted.

## C. Administration is Inequitable and Discriminatory

AT & T also contends the Texas assessment is not administered in an equitable and nondiscriminatory way, and therefore conflicts with the mandate of Section 254(f). In *TOPUC*, the Fifth Circuit evaluated the analogous mandate of § 254(d) that contributions to the FUSF be made on an equitable and nondiscriminatory basis. *TOPUC*, 183 F.3d at 434–

35; *compare* 42 U.S.C. § 254(d) ( "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis ....") *with* 42 U.S.C. § 254(f) ("Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis ...."). Ultimately, the Fifth Circuit concluded the federal surcharge at issue in that case was neither equitable nor nondiscriminatory because (1) some carriers, those that generate most of their revenues from providing international service, will contribute more money to the FUSF than they generated from providing interstate service, and yet the FCC provided no exemption for them; and (2) the surcharge damaged some carriers who provided international service more than others. *TOPUC*, 183 F.3d at 435.

The Regulation requires carriers pay 3.6% of all of their revenues, including interstate and international revenues, into the TUSF. In addition, the FUSF assesses 7.2805% of carriers' interstate and international revenues. That means multi-jurisdictional carriers pay 10.88% of their interstate and international revenues into universal services funds, along with 3.6% of their intrastate revenues. Meanwhile, post *TOPUC*, intrastate-only providers pay just 3.6% of their revenues toward universal service. AT & T argues this set up discriminates against intrastate carriers who primarily provide interstate and international services, by taxing a large portion of their revenues twice, while only taxing intrastate-only carriers' once. The Commissioners object that the Regulation is not discriminatory because it assesses all intrastate carriers at the same rate, whether or not they provide interstate services. In other words, the Regulation is facially neutral. However, in *TOPUC*, the Fifth Circuit looked beyond the facial classifications of the statute to whether the

statute impacted carriers in different ways, in other words whether there was a disparate impact. *See TOPUC*, 183 F.3d at 435 ("the FCC's interpretation is 'discriminatory' because its rule damages some international carriers more than it harms others."). AT & T contends the Regulation disparately impacts and therefore discriminates against multi-jurisdictional carriers, and the Court is inclined to agree.

■ Regardless, AT & T's stronger argument is the Regulation is unfair because carriers who primarily provide interstate service and generate a very small amount of intrastate revenues are contributing more than their fair share into the TUSF. In *TOPUC*, the Fifth Circuit acknowledged that "equitable and nondiscriminatory," refers, among other things, to "fairness in the allocation of contribution duties." *TOPUC*, 183 F.3d at 434. Under the Regulation, a carrier who only generated $10,000 per year in intrastate revenues, but $1 million per year in interstate revenues, must pay $36,000 into the TUSF. This situation is analogous to federal surcharge that required some international carriers to contribute more money into the FUSF than they generated in revenue from interstate calls. *Id.* at 434–35. Because the Regulation provides no exemption or other mechanism by which disproportionately burdened multi-jurisdictional carriers can apply for relief, the Texas assessment is not applied in an equitable manner, and thus the regulation conflicts with Section 254(f) and is preempted.

### Conclusion

In summary, the Regulation is problematic because it burdens and relies on the support mechanisms of the FUSF, and because it imposes an assessment that is not applied in an equitable and nondiscriminatory manner. Each flaw independently

renders the Regulation in conflict with federal law, which, of course, preempts the Regulation. Because the Court has concluded the Regulation is preempted on three alternative grounds, it will not consider the AT & T's broader arguments that the Regulation violates federal law because Congress preempted the field involving the regulation of the duties, charges, and liabilities attendant to providing interstate telecommunications service, or that it violates the Commerce Clause of the United States Constitution because it taxes more than the state's fair share of an interstate transaction.

In accordance with the foregoing:

IT IS ORDERED that Defendants' Motion for Summary Judgment [# 10] is DENIED;

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment [# 7] is GRANTED.

### *JUDGMENT*

BE IT REMEMBERED on the 12th day of March 2003 the Court entered its order granting plaintiffs' motion for summary judgment the above-styled cause, and thereafter enters the following judgment:

IT IS ORDERED, ADJUDGED, and DECREED that 16 Tex. Admin. Code § 26.420(f)(2), by assessing for purposes of a telecommunication carrier's contributions to the Texas Universal Service Fund the revenues of the carrier that are generated by its provision of interstate and international services within the state of Texas, is hereby DECLARED to that extent to VIOLATE federal law, specifically 47 U.S.C. § 254(f) and the Supremacy Clause of the United States Constitution;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the Commissioners of the Public Utility Commission of Texas including their agents and successors, are hereby permanently ENJOINED from assessing and collecting any Texas Universal Service Fund assessments pursuant to 16 Tex. Admin. Code § 26.420(f)(2) against the revenues of the Plaintiffs, and their successors and assigns, which are generated by their provision of interstate and international telecommunications services within the State of Texas.

IT IS FURTHER ORDERED ADJUDGED, and DECREED that all costs be taxed to the Defendants;

IT IS FINALLY ORDERED that all other relief requested by any party is DENIED.