# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 55

APRIL TERM, A.D. 2022

April 26, 2022

UNION TELEPHONE COMPANY,

Appellant
(Petitioner),

v.

THE WYOMING PUBLIC SERVICE
COMMISSION AND ITS WYOMING
UNIVERSAL SUPPORT FUND MANAGER,

Appellee
(Respondent),

and

ALL WEST COMMUNICATION, INC.;
DUBOIS TELEPHONE EXCHANGE, INC.;
RANGE TELEPHONE COOPERATIVE,
INC.; RT COMMUNICATIONS, INC.;
SILVER STAR TELEPHONE; TRI
COUNTY TELEPHONE, INC.,

Appellees
(Intervenors).

S-21-0149

*W.R.A.P. 12.09(b) Certification*
*from the District Court of Laramie County*
*The Honorable Steven K. Sharpe, Judge*

*Representing Appellant:*
    Bruce S. Asay of Associated Legal Group, LLC, Cheyenne, Wyoming. Argument
    by Mr. Asay.

*Representing Appellee, The Wyoming Public Service Commission:*
Bridget L. Hill, Wyoming Attorney General; Brandi Lee Monger, Deputy Attorney General; Karl D. Anderson, Senior Assistant Attorney General; Patrick Miller, Assistant Attorney General. Argument by Mr. Miller.

*Representing Intervenors All West Communication, Inc.; Dubois Telephone Exchange, Inc.; Range Telephone Exchange, Inc.; RT Communications, Inc.; Silver Star Telephone; and, Tri-Telephone Association, Inc.*
Elizabeth Therese Zerga of Jubin & Zerga, LLC, Cheyenne, Wyoming. Argument by Ms. Zerga.

*Before FOX, C.J., and DAVIS[*], KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

[*]*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    Union Telephone Company filed a petition for review of agency action with the district court, asserting the Wyoming Public Service Commission's (PSC's) order administering the Wyoming Universal Service Fund (WUSF) for the 2020-2021 fiscal year was unlawful and should be set aside.  "Universal Service" refers to the availability of reasonably affordable communication services to all users, especially those in rural, high cost areas.  This case involves the interplay between the Federal Universal Service Fund (FUSF) and the WUSF—complimentary funding programs collectively intended to develop voice and broadband services and promote the emergence of competition among carriers.

[¶2]    The PSC's order adopted a methodology for calculating WUSF disbursements that treated a portion of the 2019 support each Wyoming telecommunications company[1] received from the federal Alternative Connect America Cost Model (A-CAM) programs as "contributions from the [FUSF]" under Wyo. Stat. Ann. § 37-15-501 (LexisNexis 2021). Union claimed that the order "rejected existing law," violated Wyo. Stat. Ann. § 16-3-114(c), and materially prejudiced Union.  On the PSC's request, the district court certified the matter to this Court pursuant to W.R.A.P. 12.09.  We affirm.

## *ISSUES*

[¶3]    We reorganize and restate the parties' issues and sub-issues.[2]

> I. Did collateral estoppel prevent the PSC from adopting a WUSF calculation methodology that considered A-CAM funds to be FUSF contributions?
>
> II. Is the PSC's 2021 order lawful under the Wyoming Administrative Procedure Act § 16-3-114(c)?
>
> > A. Is the order supported by substantial evidence?
> > B. Is the order arbitrary and capricious?
> > C. Is the order in accordance with law?

---

[1] "'Telecommunications company' means a person engaged in the furnishing of telecommunications service within this state[.]"  Wyo. Stat. Ann. § 37-15-103(a)(xi).

[2] The parties to this appeal include Union; the PSC; and Appellee Intervenors All West Communication, Inc.; Dubois Telephone Exchange, Inc.; Range Telephone Cooperative, Inc.; RT Communications, Inc.; Silver Star Telephone; and Tri County Telephone, Inc. (collectively, the Rural Companies).  Union and the Rural Companies are all Wyoming telecommunications companies that were granted intervenor status in the PSC proceedings and "will be directly impacted by the outcome of any appellate court review and determination[.]"

1

III. Did the PSC abuse its discretion when it admitted certain of the Rural Companies' exhibits and witness testimony during the contested hearing?

## *FACTS*

[¶4]    Because this appeal involves consideration of FUSF support—and more specifically, A-CAM support—in calculating WUSF disbursements, we provide an overview of the federal and state funding framework for context.

### <u>Federal Funding</u>

[¶5]    The federal government has sought to promote "a rapid, efficient, Nation-wide . . . communication service with adequate facilities at reasonable charges" since it passed the Federal Communications Act of 1934 (FCA).  47 U.S.C. § 151.  The FCA established the Federal Communications Commission (FCC) and "empower[ed] [it] to create programs to advance universal telecommunications services in the United States."  *Id.*; *Virgin Mobile USA, L.P. v. Keen*, 447 F. Supp. 3d 1071, 1086 (D. Kan. 2020) (footnote omitted).  The FCC created the FUSF to provide funding to telecommunications companies to ensure that individuals, especially "those who live in rural and high-cost areas, and those who meet certain low-income criteria, [have] access to telecommunications services at affordable rates."  *Keen*, 447 F. Supp. 3d at 1083; *see* 47 U.S.C. § 254.

[¶6]    Prior to 2011, the FCC provided "high-cost [universal service] support" "through a complicated patchwork of programs" that only supported voice services.  *In re FCC 11-161*, 753 F.3d 1015, 1037 (10th Cir. 2014) (citation omitted).  In the late 2000s, however, the FCC sought to develop a new, more efficient, funding model that would also support broadband development.  *Id.* at 1037–38.  As a result, the FCC created the Connect America Fund (CAF) to "address the broadband availability gap" and to replace the older "patchwork of programs."  *Id.* at 1038–40.

[¶7]    The FCC implemented A-CAM I, the first version of CAF support relevant to this appeal, in 2016.  *See In the Matter of Connect Am. Fund*, 31 F.C.C. Rcd. 3087 (2016); *In the Matter of Connect Am. Fund*, 33 FCC Rcd. 11893, 11896 (2018).  A-CAM I was designed to provide support to companies over a longer period of time and obligated them to deploy broadband "to a pre-determined number of eligible locations" at one of three speeds.  *Connect Am. Fund*, 33 FCC Rcd. at 11896.  Union elected to receive A-CAM I support in 2017.  In December 2018, in a continued effort to increase access to high-speed internet, the FCC created (1) a revised version of A-CAM I (Revised A-CAM I) to provide additional support to companies who had elected A-CAM I, conditioned on increased deployment obligations; and (2) a second A-CAM program (A-CAM II), that had slightly different obligations regarding deployment areas and required speeds.  *Id.* at 11898–915.

Union subsequently switched to the Revised A-CAM I program, and all but one of the Rural Companies have since elected to receive support under A-CAM II.

### State Funding

[¶8]     Since 1995, Wyoming has provided state level universal service support through the WUSF. 1995 Wyo. Sess. Laws ch. 181; Wyo. Stat. Ann. §§ 37-15-501 et seq.  The purpose of the WUSF is to ensure that telecommunications customers located in areas of Wyoming where rates for essential telecommunications services[3] are high—generally rural areas— "pay no more than 130 percent of the statewide average price for basic local exchange service."[4]  *Pub. Serv. Comm'n of Wyo. v. Qwest Corp.*, 2013 WY 48, ¶ 8, 299 P.3d 1176, 1178 (Wyo. 2013) (citing Wyo. Stat. Ann. § 37-15-501(c), (d)).

[¶9]     The PSC requires all telecommunications companies that provide services in Wyoming to pay an assessment, calculated by the PSC, to the WUSF each year.[5]  *Id.* (citing Wyo. Stat. Ann. § 37-15-501(a), (b)).  Once customers in high-cost areas "have paid for

---

[3] "'Essential telecommunications service' means a customer's access to service that is necessary for the origination or termination, or both, of two-way, switched telecommunications for both residential and business service within a local exchange area."  Wyo. Stat. Ann. § 37-15-103(a)(iv) (LexisNexis 2021). These services are limited to:

> (A) Access to interexchange services provided by interexchange telecommunications companies;
> (B) Single line flat-rate or single line measured residence or business voice service;
> (C) Transmission service and facilities necessary for the connection between the end user's or customer's premises and local network switching facility including the necessary signaling service used by customers to access essential telecommunications services;
> (D) Services necessary to connect 911 emergency services to the local network;
> (E) Switched access, which for the purposes of this chapter shall mean the switching and transport necessary to connect an interexchange telecommunications company with the local exchange central office for the purpose of originating or terminating, or both, the interexchange telecommunications company's switched telecommunications service.

*Id.*
[4] "'Local exchange service' means the provision of essential telecommunications service within a local exchange area[.]"  Wyo. Stat. Ann. § 37-15-103(a)(viii).  A local exchange area is "a geographic territorial unit established by the commission for providing telecommunications services[.]"  Wyo. Stat. Ann. § 37-15-103(a)(vii).
[5] The assessment is passed on to customers in their bill.  *See* Wyo. Stat. Ann. § 37-15-501(b) ("The commission shall authorize a monthly charge to customers, in the amount specified by the commission, to recover each contributor's required payment to the universal service fund.").

services up to the 130 percent benchmark,[6] the WUSF distributes funds to the companies [providing services in those areas] to the extent that their basic local exchange service prices exceed the benchmark[.]" *Id.* Before distributing WUSF funds, however, the PSC must "tak[e] into account any contributions [a company received] from the [FUSF]" to ensure that Wyoming consumers are not assessed for costs that are already covered through a federal program. *Id.*; *see* Wyo. Stat. Ann. § 37-15-501(d), (g).[7]

[¶10] The PSC administers the WUSF each fiscal year—July 1 through June 30—pursuant to §§ 37-15-501 et seq. and Chapter 5 of the Wyoming Public Service Commission Rules. The process begins when the Fund Manager—a PSC employee—requests certain data from Wyoming telecommunications companies, including their rates for the past year, the essential services they provided, and their FUSF receipts. *Qwest Corp.*, ¶ 9, 299 P.3d at 1179. The Fund Manager analyzes the data, formulates recommendations on how best to administer funds for the upcoming fiscal year, and submits findings and recommendations concerning the appropriate methodology to the

---

[6] Currently, this "benchmark" is $30. Wyo. Stat. Ann. § 37-15-501(h). Beginning on July 1, 2019, the PSC "shall review the price benchmark one (1) time every four (4) years and, after review, shall adjust the benchmark as necessary to assure that it approximates one hundred thirty percent (130%) of the weighted statewide average essential local exchange service price." *Id.*

[7] Companies can elect to receive WUSF support pursuant to subsection (d) or (g). Both subsections require the PSC to consider FUSF contributions when calculating WUSF distributions.

> (d) In accordance with the method of distribution determined by the commission, a telecommunications company shall, unless it elects to receive Wyoming universal service funds pursuant to the method set forth in subsection (g) of this section, receive funds under this section to the extent that its noncompetitive essential local exchange service prices, **after consideration of any contributions from the federal universal service fund,** exceed the price benchmark established in subsection (h) of this section.
>
> . . . .
>
> (g) A telecommunications company that undertakes the requirements set forth in this subsection may make a one-time, irrevocable before July 1, 2023, election in writing to the commission to receive Wyoming universal service funds pursuant to this subsection rather than pursuant to subsection (d) of this section . . . A telecommunications company which elects to receive Wyoming universal service funds pursuant to this subsection shall receive funds to the extent that its loop costs, as reflected in the company's most recent annual filing of unseparated loop costs filed with the Universal Service Administration Company, **exceed the company's most recent annual federal universal service funds receipts** and annual local revenues.

Wyo. Stat. Ann. § 37-15-501(d), (g) (emphasis added). The differences between the two distribution mechanisms are not significant for the purposes of this appeal.

4

PSC. *Id.* When the PSC receives the Fund Manager's report, it must "set[] a hearing and provide[] notice to the companies that they may appear and comment on the [F]und [M]anager's findings and recommendations." *Id.*; *see* Wyo. Stat. Ann. § 37-15-501.

[¶11]  The PSC must annually determine "the method by which the contributions shall be calculated, collected and distributed." Wyo. Stat. Ann. § 37-15-501(b); Wyoming Public Service Commission Rules, Chapter 5.  In doing so, it may simply rely on the Fund Manager's recommendations and any comments received. *See Qwest Corp.*, ¶ 9, 299 P.3d at 1179; Wyo. Stat. Ann. § 37-15-501.  Or, if requested, the PSC must hold a contested case hearing to receive evidence and hear argument. *Qwest Corp.*, ¶¶ 1, 29–30, 299 P.3d at 1177, 1183.  The method selected must be "fair" and "promote the emergence of competition in providing local exchange service." Wyo. Stat. Ann. § 37-15-501(c).

### 2018 and 2020 Administrative Proceedings

[¶12]  During the 2018 administrative process, the PSC considered whether A-CAM I receipts should be considered "contributions from the [FUSF]" for purposes of calculating WUSF fund distributions for the 2018-2019 fiscal year.  At that time, only Union, and one other company who is not a party to this appeal, received A-CAM I funds.  The Fund Manager's report recommended that the PSC should not consider A-CAM I receipts "contributions from the FUSF."  At a public hearing, Union generally agreed with the Fund Manager, and the Rural Companies disagreed.  No telecommunications company requested a contested case hearing.  Consequently, relying on the representations of the Fund Manager in her report, public comment, and analysis and recommendations from PSC staff, the PSC issued an order summarily concluding it would not consider A-CAM I receipts as FUSF contributions when calculating WUSF distributions.

[¶13]  The Fund Manager's April 2020 report for the 2020-2021 fiscal year explained that, because more companies were receiving A-CAM support, the continued exclusion of those funds from WUSF calculations "would significantly increas[e] both the potential distribution amounts under Wyo. Stat. § 37-15-501(d), and the imputed benchmark rate, which [would] in turn drive[] an increased assessment rate."  The report analyzed several potential methods for considering A-CAM support and recommended a method that considered 25 percent of each company's A-CAM receipts as FUSF contributions.  After receiving the report, the PSC initiated its WUSF docket, set a hearing for May 5, and issued a notice setting procedural deadlines.

[¶14]  The Rural Companies submitted written comment in favor of treating A-CAM receipts as FUSF contributions and Union filed a motion to enforce the 2018 order and strike the Rural Companies' comments as inconsistent with that order.  On May 5, the PSC denied Union's motion, adopted the Fund Manager's recommended methodology on an interim basis, and welcomed "requests for a contested case hearing" on the issue.

5

[¶15] Union and the Rural Companies each filed motions to intervene and requested a contested case hearing. The PSC granted the motions. After a lengthy prehearing process involving discovery, the exchange of written testimony, and a first and second amended report from the Fund Manager, the PSC held an exhibit conference and a formal contested case hearing on November 19, 2020.

[¶16] At the exhibit conference, Union and the Rural Companies introduced exhibits in support of their proposed alternative methodologies for dealing with A-CAM receipts. Union objected to the Rural Companies' Exhibits 301 through 314, which consisted of reports Union had filed with various regulatory agencies, as irrelevant and unduly repetitious. The hearing examiner admitted the exhibits over Union's objection.

[¶17] At the hearing, the PSC heard the parties' arguments and witnesses' testimony. Union objected to Donald Jackson's oral testimony, arguing it went beyond the scope of his pre-filed testimony. The hearing examiner allowed the testimony.

[¶18] At the PSC's request, the parties filed post-hearing briefs in December. Union remained steadfast that the PSC's 2018 decision was binding, and the PSC could not now consider A-CAM I receipts when calculating WUSF distributions. Union argued that A-CAM II differed from A-CAM I and Revised A-CAM I and therefore the PSC could treat funds from only A-CAM II as FUSF contributions. Accordingly, Union urged the PSC to adopt the Fund Manager's Analysis 10, under which a portion of the Rural Companies' A-CAM II receipts would be considered FUSF contributions when calculating WUSF distributions, but Union's Revised A-CAM I receipts would not be considered FUSF contributions and its WUSF distribution would remain unchanged.

[¶19] The Rural Companies argued that the 2018 order was not binding because it only applied to the 2018-2019 fiscal year. They also maintained that the A-CAM programs served the same core purpose—"supporting the provision, maintenance, and operation of a voice and broadband-capable network in high-cost areas"—and therefore should be treated the same when calculating WUSF distributions. The Rural Companies advocated for either of two methodologies set forth in their Exhibits 322 and 323, each of which considered a portion of any A-CAM funding a company received to be FUSF contributions.

[¶20] After holding public deliberations in December, the PSC issued its order in January 2021. First, it concluded it was not bound by its 2018 order because new facts were in issue in 2020 and the 2018 order only applied to the 2018-2019 fiscal year. Then, it adopted the methodology proposed in the Rural Companies' Exhibit 323 (Methodology 323), finding that it was "the most appropriate methodology to account for A-CAM funds," because it was "A-CAM and Wyoming centric, while also meeting the critically important statutory policy goals of being equitable, predictable, and transparent."

6

[¶21] The PSC denied Union's request for rehearing. This appeal comes to us on certification pursuant to W.R.A.P. 12.09.

## DISCUSSION

### I. The PSC was not collaterally estopped from adopting a WUSF calculation methodology that considered A-CAM funds to be FUSF contributions.

[¶22] As noted above, the PSC is required to administer the WUSF annually based on recommendations from the Fund Manager and comments or evidence submitted by Wyoming companies and PSC staff. *See* Wyo. Stat. Ann. § 37-15-501(e)(ii), (g) (discussing "distributions from the universal service fund in any fiscal year" and "annual" filings, receipts, and revenues); *see also* Wyoming Public Service Commission Rules ch. 5 (4/16/18). Accordingly, the PSC's 2018 order specifically stated that "[t]he purpose of this proceeding is to establish a final WUSF assessment level for the twelve-month period beginning July 1, 2018, pursuant to Chapter 5, Section 3(b) of the Commission's Rules." Union nevertheless argues that collateral estoppel applies in this case and bars the PSC's 2021 ruling.[8]

[¶23] Union asserts that because the PSC determined that A-CAM I receipts would not be considered FUSF contributions for the purposes of calculating WUSF distributions in 2018, collateral estoppel precluded the PSC from adopting a WUSF calculation methodology that treats a portion of each company's A-CAM receipts as FUSF contributions for the 2020-2021 WUSF fiscal year. The PSC rejected this argument and concluded it was not bound by its 2018 order. We review the application of collateral estoppel de novo. *Mattheis v. Mulligan*, 2021 WY 14, ¶ 10, 479 P.3d 1213, 1217 (Wyo. 2021) (citing *In re Robert & Irene Redland Family Tr., Dated Aug. 10, 1989*, 2019 WY 17, ¶ 15, 435 P.3d 349, 356 (Wyo. 2019)).

---

[8] Union also discusses the doctrine of res judicata and asserts that the PSC's 2018 ruling was legal precedent, thus alluding to the doctrine of stare decisis. Because Union does not present cogent argument or citation to authority supporting the application of either of these doctrines, we decline to address them. *See Reyes v. State*, 2022 WY 41, ¶ 27, 505 P.3d 1264, 1271 (Wyo. 2022) (citing *Silva v. State*, 2014 WY 155, ¶ 7, 338 P.3d 934, 936 (Wyo. 2014)).

Additionally, Union suggests that the PSC engaged in statutory interpretation in its 2018 order when it decided not to consider A-CAM funds "contributions from the FUSF" for the 2018-2019 WUSF fiscal year. The PSC summarized the PSC staff's statutory analysis in its 2018 order, but it did not adopt or incorporate that analysis into its decision or engage in any independent statutory analysis. Instead, it summarily concluded that A-CAM I funds would not be considered contributions from the FUSF for the 2018-2019 WUSF fiscal year. That conclusion must be considered in the context of the 2018 proceedings, which did not include a contested case hearing and occurred before A-CAM was revised and participation in the various A-CAM programs became more widespread. *See supra* ¶ 12, *infra* ¶¶ 28–29.

7

[¶24] Collateral estoppel bars parties from relitigating "previously litigated issues and is a principle of law that generally applies to issues adjudicated before an administrative agency." *Lower v. Peabody Powder River Servs., LLC*, 2020 WY 33, ¶ 14, 459 P.3d 443, 447 (Wyo. 2020) (citation omitted); *see also Slavens v. Bd. of Cty. Comm'rs for Uinta Cty.*, 854 P.2d 683, 685–86 (Wyo. 1993) (explaining that collateral estoppel applies in the administrative context). Collateral estoppel bars consideration of an issue when four elements are satisfied:

> (1) the issue decided in the prior proceeding must be identical to the issue presented in the present action; (2) the prior proceeding must have resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) the party against whom collateral estoppel is asserted must have had a "full and fair opportunity to litigate the issue in the prior proceeding."

*Mattheis*, ¶ 13, 479 P.3d at 1217–18 (quoting *Casiano v. State ex rel. Wyo. Dep't of Transp.*, 2019 WY 16, ¶ 10, 434 P.3d 116, 120 (Wyo. 2019)).

[¶25] Determining whether collateral estoppel applies requires that we "compare the prior adjudication with the present action." *Id.* ¶ 14, 479 P.3d at 1218 (citation omitted); *see also In re Adoption of ADA*, 2006 WY 49, ¶ 12, 132 P.3d 196, 201 (Wyo. 2006) (explaining that collateral estoppel requires comparing the prior and present actions); 1A Stuart M. Speiser et al., *The American Law of Torts* § 5:24 (Mar. 2020 Update) ("In applying the doctrine of collateral estoppel, the court must ascertain the issues necessarily decided by the prior judgment and determine which of those issues, if any, are germane to the present litigation.").

[¶26] A comparison of the 2018 and 2020 PSC proceedings reveals that the issues in the two actions were not identical. In 2018 the PSC determined whether two companies' 2017 A-CAM I receipts should be considered FUSF contributions when calculating WUSF support for the 2018-2019 WUSF fiscal year. The PSC did not attempt to revisit or change that specific ruling in the recent proceedings. Instead, the PSC more recently considered the issue of whether a portion of the 2019 Revised A-CAM I and A-CAM II support received by eight Wyoming companies should be treated as FUSF contributions when calculating WUSF support for the 2020-2021 WUSF fiscal year. Because the issues considered by the PSC in the two proceedings were not identical, collateral estoppel does not apply. *See Taylor v. State, ex rel., Wyo. Workers' Safety and Comp. Div.*, 2010 WY 76, ¶¶ 16–20, 233 P.3d 583, 587–88 (Wyo. 2010) (concluding collateral estoppel did not apply because "[t]he issue determined in 1998 was whether Mr. Taylor's chiropractic treatment . . . was related to the 1991 work injury[,]" while the later litigation "determined whether Mr. Taylor's treatment in 2007 was related to the 1991 work injury").

[¶27] Furthermore, we have held that collateral estoppel will not apply when the essential facts have changed since the first adjudication. *See Worman v. Carver*, 2002 WY 59, ¶ 22, 44 P.3d 82, 88 (Wyo. 2002) ("[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." (quoting *Montana v. United States*, 440 U.S. 147, 159, 99 S.Ct. 970, 976, 59 L.Ed.2d 210 (1979))); *Albretch v. Zwaanshoek Holding En Financiering, B.V.*, 816 P.2d 808, 814 (Wyo. 1991) (collateral estoppel does not apply "if the facts have changed since the previous suit") (citation omitted)); *Osborn v. Manning*, 798 P.2d 1208, 1211 (Wyo. 1990); *see also* 50 C.J.S. *Judgments* § 1043, Westlaw (database updated Mar. 2022) ("The estoppel of a judgment extends only to the facts in issue as they existed at the time the judgment was rendered, and does not prevent a reexamination of the same questions where in the interval the facts have changed[.]").

[¶28] The facts and circumstances—specifically, the number of companies utilizing A-CAM programs, the versions of A-CAM programs available, and the impact of excluding A-CAM funds from the WUSF calculations—had changed significantly during the interim between the 2018 and 2020 proceedings. During the 2018 proceedings, only A-CAM I was in existence, and only Union and one other Wyoming company received A-CAM I funding. That year, the Fund Manager recommended the PSC adopt a WUSF calculation methodology that did not consider A-CAM funds. The Fund Manager opined that this would not negatively impact the benchmark price paid by rural customers or the assessment rate imposed on companies, and passed on to customers, to fund the WUSF. When the PSC adopted the recommended methodology, the benchmark price remained $30 and the assessment rate was 1.7 percent.

[¶29] By April 2020, however, at least eight Wyoming companies were receiving A-CAM support. Union and one other company had switched from A-CAM I to Revised A-CAM I, and almost all of the Rural Companies had elected A-CAM II. During the 2020 proceedings, the Fund Manager recommended that the PSC should begin considering a portion of the A-CAM funds each company received as FUSF contributions. The Fund Manager cautioned that not doing so "would significantly increase" the WUSF distribution amounts, the benchmark rate, and in turn, the assessment rate. The Fund Manager submitted calculations demonstrating that continuing to ignore all A-CAM support in WUSF calculations would result in a benchmark price of $37 and an assessment rate of 2.5 percent. In effect, consumers could pay a higher fee on their bills, and companies would receive duplicative funding.

[¶30] This different set of facts and circumstances precludes the application of the doctrine of collateral estoppel and highlights the importance of the PSC's annual review of the WUSF methodology. *See Sinclair Oil Corp. v. Wyo. Pub. Serv. Comm'n*, 2003 WY 22, ¶ 9, 63 P.3d 887, 893 (Wyo. 2003) (the "PSC is required to give paramount consideration to the public interest in exercising its statutory powers to regulate and

9

supervise public utilities" (citing *Tri Cty. Tel. Ass'n, Inc. v. Pub. Serv. Comm'n*, 11 P.3d 938, 941 (Wyo. 2000)).

[¶31] In sum, we conclude the nature of the PSC's annual WUSF review, the lack of identical issues between the proceedings, and the change in facts and circumstances essential to the PSC's rulings all preclude the application of collateral estoppel in this case.

## II. The PSC's 2021 order is lawful under Wyo. Stat. Ann. § 16-3-114(c).

[¶32] We review an administrative agency's decision certified to this Court pursuant to W.R.A.P. 12.09 under the standards set forth in the Wyoming Administrative Procedure Act. *Exaro Energy III, LLC v. Wyo. Oil & Gas Conservation Comm'n*, 2020 WY 8, ¶ 9, 455 P.3d 1243, 1248 (Wyo. 2020) (citation omitted). In relevant part, that act provides:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> . . . .
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021).

[¶33] When the parties submit evidence at a contested case hearing, we start by applying the substantial evidence standard of review to fact findings. *See Reichenberg v. State ex rel. Dept. of Workforce Servs.*, 2022 WY 36, ¶ 28, 506 P.3d 732, 741 (Wyo. 2022) (citing *Ross v. State ex rel. Dept. of Workforce Servs.*, 2022 WY 11, ¶ 9, 503 P.3d 23, 28 (Wyo. 2022)). However, even if the record "contains sufficient evidence to support the

administrative decision under the substantial evidence test," we still apply "the arbitrary-and-capricious standard as a 'safety net' to catch other agency action that may have violated the Wyoming Administrative Procedures Act." *Id.* ¶ 29, 506 P.3d at 742 (quoting *Mirich v. State ex rel. Bd. of Trs. of Laramie Cty. Sch. Dist. Two*, 2021 WY 32, ¶ 16 n.4, 481 P.3d 627, 633 n.4 (Wyo. 2021)). We review "conclusions of law de novo and affirm only if [they] are in accordance with the law." *Id.* ¶ 30, 506 P.3d at 742 (quoting Wyo. Stat. Ann. § 16-3-114(c)(ii)(A)). We note in applying this standard, that Union does not challenge the adopted methodology's compliance with the Wyoming Telecommunications Act's Universal Service Fund provisions, Wyo. Stat. Ann. §§ 37-15-501 and -502.

## A.      The order is supported by substantial evidence.

[¶34]  "Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions." *Painter v. Hallingbye*, 2021 WY 78, ¶ 11, 489 P.3d 684, 689 (Wyo. 2021) (quoting *Exaro Energy*, ¶ 10, 455 P.3d at 1248). "It is more than a scintilla of evidence." *Id.* (quoting *Exaro Energy*, ¶ 10, 455 P.3d at 1248). "[O]ur review turns on whether the agency could reasonably conclude as it did, based on the evidence before it—not whether we agree with the outcome." *Id.* (citing *Mirich*, ¶ 16, 481 P.3d at 633). Under this limited review, "the judicial function is exhausted when we can find from the evidence a rational view for the conclusions of the PSC." *Sinclair*, ¶ 9, 63 P.3d at 893 (citing *Tri Cty.*, 11 P.3d at 941). The burden is on the party challenging the agency decision to establish that the decision is not supported by substantial evidence. *Union Tel. Inc. v. Wyo. Pub. Serv. Comm'n*, 821 P.2d 550, 557 (Wyo. 1992) (citation omitted).

[¶35]  Instead of demonstrating a lack of record evidence to support the PSC's findings, Union advocates consideration of its own evidence and the relative merits of Analysis 8.[9] To the extent Union argues that the PSC's ruling is not supported by substantial evidence because (1) its explanation is conclusory, (2) the PSC never addressed some of Union's concerns about Methodology 323, and (3) Methodology 323's "tier adjustments are wholly unsupported by any testimony or workpaper," we conclude its arguments do not reflect or apply the well-settled substantial evidence standard of review stated above. Our analysis of whether the evidence provides a rational basis for the PSC's two key conclusions follows.

### i. Substantial evidence supports the PSC's decision to treat a portion of A-CAM funds as FUSF contributions.

[¶36]  The PSC rules define "Contributions from the Federal Universal Service Fund" as "funds received from the FUSF as reported to the [PSC] for high cost support mechanisms

---

[9] Going into the contested case hearing, Union supported Analysis 8. During the hearing, however, Union abandoned its support for Analysis 8 in favor of Analysis 10. On appeal, Union argues the PSC should have selected Analysis 8.

11

that will assist customers located in areas with relatively high rates for noncompetitive essential local exchange service[.]" Wyoming Public Service Commission Rules ch. 5, § 1(c)(i). Thus, whether or not A-CAM funds should be considered FUSF contributions depends on whether A-CAM (1) is a high cost support mechanism, (2) assists customers in noncompetitive areas, and (3) supports essential local exchange service. *See id.* The PSC found that A-CAM met this definition, stating "the purpose of A-CAM as a whole is to assist carriers in providing service in high-cost and non-competitive areas[,] such as providing voice and broadband-capable networks."[10] This finding is supported by substantial evidence in the record.

[¶37] First, Chris Reno, Union's own witness, testified that the Connect America Fund is "a modernized version of the High Cost FUSF." The Rural Companies' witness, Jason Hendricks, the Chief Government Relations Officer for several of the Rural Companies, testified in both his written and oral testimony that A-CAM "is a federal high cost universal service program," and his written testimony further explained that A-CAM was designed to serve as a replacement for previous high-cost support programs.

[¶38] Second, as far as supporting customers in noncompetitive areas, Mr. Reno's written testimony established that in creating the A-CAM programs, "the FCC hoped to 'spur new broadband deployment in rural areas[.]'" He explained that A-CAM "[s]upport is not available in census blocks where an unsubsidized competitor is [already] providing . . . service." Mr. Hendricks clarified that A-CAM support calculations specifically "eliminate[] certain low-cost and competitive areas from eligibility." And, at the contested case hearing, Michelle Motzkus, of Silver Star Communications, testified that the A-CAM model provides funding that enables companies "to provide noncompetitive voice services at reasonable prices."

[¶39] The final inquiry, whether A-CAM supports essential local exchange service, requires a deeper dive into statutory definitions. As noted above, *see supra* n.4, Wyo. Stat. Ann. § 37-15-103(a)(viii) defines "local exchange service" as "the provision of essential

---

[10] In concluding that a portion of A-CAM support should be considered FUSF contributions for the purpose of calculating WUSF funds, the PSC also found:

> The legislative intent expressed in Wyo. Stat. [§] 37-15-501(a) & (c), is to both promote the emergence of competition and support only non-competitive essential local exchange services, which requires us to consider a portion of A-CAM, as we have here, in determining the appropriate level of WUSF support to be provided to qualified telecommunications companies. The evidence indicates that a portion of A-CAM supports the same non-competitive essential local exchange services the WUSF is intended to support under the statute. Without consideration of a portion of A-CAM, the assessment paid by customers of all Wyoming telecommunications companies would unnecessarily increase, to replicate a portion of, rather than supplement federal support.

telecommunications service within a local exchange area[.]" Subsection (a)(iv) provides an exhaustive list of what qualifies as "essential telecommunications service." Included within that list is "residence or business voice service[,]" *see* § 37-15-103(a)(iv)(B), and, in this regard, the pertinent question during the PSC proceedings was whether A-CAM funds support voice service—an essential local exchange service.

[¶40] Ms. Motzkus testified in both her written testimony and at the hearing that "ACAM funding supports voice and broadband networks[.]" Also at the hearing, Mr. Hendricks explained that when the FCC developed the A-CAM models, it did not remove the requirement that qualifying companies must provide voice services. And, when directly asked whether A-CAM receipts should be considered in WUSF calculations, Jack Walkenhorst, of All West Communications, responded "[y]es, because a carrier who receives ACAM is required to provide voice services and ACAM supports voice services."

[¶41] Collectively, this testimony amounts to more than a scintilla of evidence which a reasonable mind might accept to support the PSC's decision to treat a portion of A-CAM funds as FUSF contributions when calculating WUSF distributions.

### ii. Substantial evidence supports the PSC's decision to adopt Methodology 323.

[¶42] Once it determined that A-CAM funds qualify as FUSF contributions for the purposes of calculating WUSF support, the PSC had to determine which calculation methodology was the most appropriate for the 2020-2021 WUSF fiscal year. The PSC ultimately selected Methodology 323, finding that it was "the most appropriate methodology to account for A-CAM funds in making WUSF disbursements" because it was "A-CAM and Wyoming centric, while also meeting the critically important statutory policy goals of being equitable, predictable, and transparent." The record contains substantial evidence to support this finding.

[¶43] Mr. Hendricks, an A-CAM cost model expert, testified that he developed the two methodologies set forth in Exhibits 322 and 323. He explained that after analyzing the other proposed methodologies, he sought to develop one that was A-CAM based, equitable, predictable, transparent, carrier specific, treated similarly situated companies similarly, and which would eliminate each carrier's out of state A-CAM receipts from the WUSF calculations. The other rural companies supported both methodologies.

[¶44] Mr. Hendricks and Nathan Weber, another witness for the Rural Companies, each explained that both methodologies start with a company's specific A-CAM award data accessed through public FCC documents to promote transparency. Then, through a series of calculations both methodologies isolate each company's Wyoming-specific A-CAM funded locations, and further isolate the Wyoming locations that are deemed by the FCC

13

to be fully funded.[11] The primary difference between the two methodologies is that while 322 begins with a carrier's full A-CAM receipts (which may include funding for locations in other states), Methodology 323 first isolates each carrier's A-CAM receipts attributable only to Wyoming locations. The methodologies then utilize different ratios—Methodology 323 looks at a company's fully funded A-CAM locations in Wyoming against its total Wyoming A-CAM support amount—to determine each company's allocation tier and that tier is used to calculate the company's WUSF support amount. Because Methodology 323 starts by considering less federal support, it generally produces a smaller FUSF contribution and, therefore, a larger WUSF contribution.

[¶45] Mr. Hendricks' testimony reinforces that Methodology 323 is A-CAM and Wyoming centric as the calculations are designed to isolate those portions of A-CAM funds that support locations in Wyoming that are fully funded by the FCC, and deducts only a portion of that support in its WUSF calculations. His testimony also clearly supports the Commission's findings as to why the methodology was superior to the others presented:

> The Rural Companies' proposed ACAM allocation method is transparent because anyone can access the FCC data used as inputs, see the formulas used in the calculations, and replicate the results. There is nothing hidden in a black box behind the veil of confidentiality. The proposed ACAM allocation methodology is predictable because ACAM recipients will know exactly how much ACAM will count as Federal High Cost Support in WUSF calculations for the foreseeable future. The proposed ACAM allocation methodology is equitable because the same formulas are used for all ACAM recipients and similarly situated companies are treated similarly.

[¶46] Rather than directly challenge the PSC's adoption of Methodology 323 on a substantial evidence basis, Union argues on appeal that Analysis 8 was a more appropriate method for calculating WUSF support. Notably, however, the record reflects that both Union and the Rural Companies criticized Analysis 8 prior to and during the hearing. Union's witness, Douglas Meredith, filed testimony criticizing the calculations upon which Analysis 8 was based. The Rural Companies took issue with the fact that it used inputs and formulas from older FUSF programs as a proxy to determine A-CAM contributions and argued that the older programs had no bearing on A-CAM awards as the programs were based on different concepts and data. Furthermore, the inputs for Analysis 8 were unreliable and not transparent because the financial inputs were company generated and some companies arrived at those inputs based on data they considered proprietary and

---

[11] Fully-funded locations are those considered by the FCC "to have enough support to cover the cost of providing broadband to the locations after ten years."

14

confidential. In fact, Union abandoned its support for Analysis 8 during the contested case hearing in favor of analysis 10.

[¶47] There is no question the evidence of record in support of Methodology 323 is substantial and Union failed its burden to prove otherwise.

### B. The order is not arbitrary and capricious.

[¶48]

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Reichenberg*, ¶ 29, 506 P.3d at 742 (quoting *Matter of Worker's Compensation Claim of Vinson*, 2020 WY 126, ¶ 27, 473 P.3d 299, 309 (Wyo. 2020)). This standard "is not meant to apply to true evidentiary questions." *Id.* (quoting *McIntosh v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2013 WY 135, ¶ 31, 311 P.3d 608, 616 (Wyo. 2013)). It instead applies "when, for example, the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law." *Id.* (quoting *McIntosh*, ¶ 31, 311 P.3d at 616).

[¶49] Union asserts the PSC's decision to adopt Methodology 323 is arbitrary and capricious in several ways. Mostly, Union argues the decision is arbitrary because it ignored the PSC's 2018 order. We disagree. We have already concluded that the PSC was not collaterally estopped from changing the methodology it adopted in 2018, and that substantial evidence supported both the PSC's finding that A-CAM receipts could be considered FUSF contributions and its adoption of Methodology 323. Consequently, we can easily conclude that the record provides a rational basis for the PSC's decision. The fact that Union's WUSF contribution will be reduced as a result of the PSC's 2021 decision does not render that decision arbitrary and capricious.

[¶50] Union further asserts Methodology 323 is arbitrary and capricious in a handful of other, more narrow arguments. We address each of Union's arguments in turn.

[¶51] Union first argues that Methodology 323 does not take into account that Union receives A-CAM support based on all of the locations the company serves including those outside of Wyoming. This assertion is patently incorrect, as the record demonstrates that Methodology 323 was specifically designed to remove funding associated with companies'

locations outside of Wyoming for each company in exactly the same manner. In fact, the PSC rationally based its decision, in part, on that particular aspect of Methodology 323.

[¶52] Second, Union contends that this methodology fails to acknowledge that costs vary among different A-CAM funded locations. Here again, the record does not support Union's contention. Mr. Hendrick's testimony explained how Methodology 323 accounts for those differences:

> I fully acknowledge that costs per location in ACAM differ. As previously discussed, very low-cost locations are excluded from ACAM eligibility and very high cost locations receive capped support. In between are the fully funded locations that have variations in ACAM-calculated costs per location between $52.50 and $252.50 in non-tribal areas. The costs to serve these locations in the real world will also vary between the locations, as well as between what ACAM estimates and what the costs will actually be to serve these locations. Carriers knew this when they chose ACAM. However, the FCC provided flexibility for companies to choose which locations to serve within the eligible areas and flexibility on the technology to meet the buildout requirements. So, even if the [PSC] were to have access to the confidential ACAM cost-per-location calculations (which it does not), that doesn't mean those are the costs that companies will actually incur to serve the locations. In addition, the [PSC] has no way to know what locations a carrier will choose to serve. The best we can do is use the aggregate support amounts calculated for fully funded eligible locations to determine what the FCC has chosen to pay companies to meet their buildout requirements. That is exactly what the Rural Companies have done in our proposed [Methodology 323].

[¶53] Union next claims that Methodology 323 treats the different types of A-CAM support the same, even though some A-CAM II recipients received earlier funding for the same locations A-CAM II now supports and this methodology essentially allows those companies to double dip into federal funds for the same locations. Several of the Rural Companies' representatives testified that this was not true. Mr. Hendricks testified that

> [o]nce the Range Companies elected ACAM II in 2019, they began receiving ACAM support and the funding they initially received in 2019 under those old historic programs was "trued-up" to zero through offsets to the ACAM II receipts. Thus, there was not and is not double recovery of Range's previous

16

investments through ACAM.  The same process occurred for all companies who elected ACAM II in Wyoming.

Mr. Walkenhorst and Ms. Motzkus each explained that Methodology 323 treated any locations that previously received funding for broadband buildout as already fully funded and therefore ineligible for WUSF support.  When directly asked about Union's accusation that A-CAM II recipients were engaging in double dipping, Ms. Motzkus stated "[a]s to Silver Star, I would rate those statements as false" and Mr. Walkenhorst referred to the argument as "a red herring," noting that "[f]rom All West's experience it is not anywhere close to accurate."  *See Watkins v. State ex rel. Wyoming Medical Comm'n*, 2011 WY 49, ¶ 23, 250 P.3d 1082, 1090 (Wyo. 2011) (explaining that we generally defer to the fact finder's witness credibility determinations (citation omitted)).

[¶54]  Union also argues that Methodology 323 utilizes arbitrary allocation tiers.  Mr. Hendricks' testimony clarifies that Methodology 323 uses different allocation tiers in its calculations based on "each company's ratio of Wyoming ACAM fully funded locations."  The point of these tiers is to "mitigat[e] any underestimation of costs that may have occurred in the ACAM cost estimate."  He explains why the allocation tiers are not arbitrary:

> I disagree that the tiers are not rational.  Unlike the across-the-board equal ACAM allocation percentages that were examined and considered by the Fund Manager, the allocation tiers proposed by the Rural Companies are not arbitrary but instead directly relate to and reflect verifiable and supportable actual ACAM data.  They reflect genuine real differences in the individual companies' fully funded locations, and hence the need or lack thereof for WUSF support.  They are also equitable in application between carriers and produce reasonable benchmark and assessment rates.

The PSC could rationally rely on this explanation when adopting Methodology 323.

[¶55]  Lastly, Union claims that the PSC did not make adequate findings of fact to support its decision to adopt Methodology 323.  We require only that an order "contain the basic findings of fact upon which the hearing examiner based his ultimate conclusions[.]"  *Birch v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2014 WY 31, ¶ 13, 319 P.3d 901, 907 (Wyo. 2014) (quoting *Leavitt v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2013 WY 77, ¶ 29, 307 P.3d 835, 842 (Wyo. 2013)).  We have held that an agency's "findings must be sufficient to permit us to determine whether the agency decision was supported by substantial evidence and was otherwise reasonable."  *Id.* (quoting *Leavitt*, ¶ 29, 307 P.3d at 842).

[¶56]  The PSC's findings are adequate in this case.  Its written order set forth several comprehensive paragraphs detailing the analyses presented, and the parties' evidence and arguments.  Then, it found that "[t]he uncontested testimony of Mr. Hendricks [was], by itself, sufficient to support [the] conclusion that the Rural Companies' [Methodology 323] provides the appropriate methodology for accounting for A-CAM funds in determining WUSF contributions and disbursements."  The PSC explained that, based on the evidence, Methodology 323 was "the most appropriate methodology" because it was "A-CAM and Wyoming centric" and it met "statutory policy goals of being equitable, predictable, and transparent."  Union has failed to demonstrate that the PSC's order adopting Methodology 323 is arbitrary and capricious.

## C.    The order is in accordance with law.

[¶57]  Union makes an additional argument we must review, de novo, under Wyo. Stat. Ann. § 16-3-114(c)(ii)(A).  *See In re Hartmann*, 2015 WY 1, ¶ 19, 342 P.3d 377, 382 (Wyo. 2015) ("Questions of law raised in an administrative context are reviewed by this Court *de novo*." (citation omitted)).  Union contends that the PSC's adoption of a methodology that results in a lower WUSF payment to Union impermissibly burdens the A-CAM programs because it "forc[es] Union to use ACAM proceeds for an under-funded state program."  For this reason, Union asserts the PSC's action is contrary to and preempted by federal law.

[¶58]  Union fails to explain, with cogent argument and citation to pertinent authority, how the PSC's order forces Union to misuse its federal funding.  We find nothing in the PSC's order, or the rest of the record that clearly supports this assertion.  Conversely, the PSC's order explains that WUSF support is designed simply to "supplement federal support" and to ensure that companies did not receive state funding for locations that were considered fully-funded by the FCC.  And furthermore, the record demonstrates that Union certified to the PSC its 2019 A-CAM funds would be expended only to support its A-CAM obligations.[12]

[¶59]  Federal preemption can occur in either of two ways:

> If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.  If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to

---

[12] We understand that Union made long-term business decisions based on the amount of WUSF funding it received in 2018-2019, and it is dissatisfied with its decreased WUSF support for the 2020-2021 fiscal year.  However, Union retains the opportunity to bring a rate case pursuant to Wyo. Stat. Ann. § 37-15-203 to demonstrate that its rates need to be adjusted to adequately cover its costs.

18

comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Matter of Adoption of MAJB*, 2020 WY 157, ¶ 17 n.8, 478 P.3d 196, 202 n.8 (Wyo. 2020) (emphasis omitted) (quoting *Hermes Consol., Inc. v. People*, 849 P.2d 1302, 1306 (Wyo. 1993)). 47 U.S.C. § 254(f) expressly provides that "[a] State may adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service." Congress therefore did not intend to occupy the field.

[¶60] Moreover, cases that have addressed federal preemption of state universal service programs generally involve state assessments on federal support. *See, e.g.*, *Keen*, 447 F. Supp. 3d at 1076, 1092–93 (invalidating an administrative order that required carriers to pay state assessments on funds received from a FUSF program, in part because it violated 47 U.S.C. § 254(e)'s requirement that FUSF funds be used for the services "for which the support is intended"); *AT&T Corp. v. Pub. Util. Comm'n of Texas*, 252 F. Supp. 2d 347, 352 (W.D. Tex. 2003) (found that a regulation that required carriers to pay tax on telecommunication revenue to the Texas Universal Service Fund impermissibly burdened a FUSF mechanism because it disincentivized carriers to provide interstate services by double taxing those services). The PSC's order does not require Union to pay an assessment on its FUSF support to the WUSF, and Union has failed to explain exactly how the order has otherwise caused it to misuse its federal support. Because we find nothing in 47 U.S.C. § 254 that preempts the mere consideration of federal support when calculating state distributions, and nothing in the record demonstrates an actual conflict with the A-CAM programs, making it impossible for Union to comply with both state and federal law or creating any obstacle to the accomplishment of the FUSF's purposes and objectives, we cannot conclude that the PSC's order violates federal law.

### III. The PSC did not abuse its discretion when it admitted the Rural Companies' exhibits and witness testimony.

[¶61] Union contends the PSC abused its discretion when it admitted certain of the Rural Companies' exhibits and witness testimony over Union's objections.

[¶62] An agency has discretion to rule on the admissibility of evidence and we will not disrupt its evidentiary rulings unless it abused its discretion. *Johnson v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2014 WY 33, ¶ 14, 321 P.3d 318, 322 (Wyo. 2014) (citing *Greene v. State ex rel. Bd. of Chiropractic Exam'rs*, 2009 WY 42, ¶ 9, 204 P.3d 285, 290 (Wyo. 2009)). An abuse of discretion occurs "when the decision shocks the conscience of

the court and appears to be so unfair and inequitable that a reasonable person could not abide it." *Id.* (citation omitted).[13]

### A.    Exhibits 301 through 314

[¶63]   Union argues on appeal, as it did before the PSC, that the Rural Companies' Exhibits 301 through 314, which consisted of "reports [Union] had provided to the [PSC] and others pursuant to statutory authority[,]" were "irrelevant, immaterial, or unduly repetitious" and should have thus been excluded under Wyo. Stat. Ann. § 16-3-108(a).  Union contends the exhibits contained "sensitive financial" information that "had nothing to do with the issue before the [PSC]" and that "the approximately 350 pages" of exhibits were unduly repetitious and burdened the docket.

[¶64]   Wyo. Stat. Ann. § 16-3-108(a) "requires the exclusion of evidence only if it is irrelevant, immaterial, or unduly repetitious." *Zowada v. Mullinax Concrete Serv. Co., Inc.*, 2014 WY 121, ¶ 26, 335 P.3d 455, 461 (Wyo. 2014) (citing Wyo. Stat. Ann. § 16-3-108(a)).   The Wyoming Rules of Evidence generally do not apply to administrative proceedings, but "the definition of relevance contained in them is instructive." *Id.* ¶ 27, 335 P.3d at 461.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401.

[¶65]   The PSC's written order explained that the exhibits were relevant to Mr. Jackson's testimony.   Mr. Jackson's testimony offered concerns about one of the suggested methodologies before the PSC during the contested case hearing—Analysis 8—and he relied on Union's past reports, Exhibits 301 through 314, to demonstrate his concerns with that option.  Because the purpose of these proceedings was for the PSC to determine the best calculation methodology for the fiscal year, and the exhibits in question supported testimony regarding concerns about one of the proposed methodologies, the PSC did not abuse its discretion in ruling that the exhibits were relevant.  Additionally, the PSC reasonably concluded during the exhibit conference that the exhibits were not unduly repetitious as they consisted of reports covering "different years" and "different states" and therefore contained varying information.

---

[13] Union's evidentiary challenges were not included in its petition for review filed with the district court. W.R.A.P. 12.09(a) provides that our review is limited "to the issues set forth in the petition *and* raised before the agency." (Emphasis added.)  Thus, where a party fails to raise an issue both during the agency proceedings, and in its petition for review to the district court we may decline to address it on appeal. *See Anderson v. Bd. of Cty. Comm'rs of Teton Cty.*, 2009 WY 122, ¶ 19, 217 P.3d 401, 406 (Wyo. 2009) (explaining that the "better practice, obviously, is to clearly state all appellate issues in the petition for review").  Under the circumstances presented here, where the issues on appeal were raised with the PSC, and no party argues that Union has waived its right to challenge the PSC's evidentiary rulings, we will review the record and consider the arguments. *See id.*

[¶66]   Union has not otherwise demonstrated that this ruling "shocks the conscience" or is "so unfair and inequitable" as to be unreasonable. *Johnson*, ¶ 14, 321 P.3d at 322.  For these reasons, we find no abuse of discretion.

## B.      Witness Testimony

[¶67]   Union also objected to Mr. Jackson's oral testimony and argued it should not have been allowed because it went beyond the scope of his pre-filed testimony.  According to Union, Mr. Jackson's testimony was "unfair" and "a surprise" because it "introduced concepts and issues that were not in his pre-filed testimony."  Union claims its due process rights were violated because the new testimony "prevented Union [] from conducting an appropriate cross-examination."   Lastly, Union asserts that allowing this testimony amounted to reversible error.  We disagree with each of Union's contentions.

[¶68]   The PSC allowed the parties to submit written testimony in accordance with Wyo. Stat. Ann. § 16-3-108.  The Rural Companies filed Mr. Jackson's testimony as Exhibit 300. Then, in its scheduling orders, the PSC requested that "[f]or each witness who will testify to matters not included in pre-filed testimony," the parties shall file "a brief summary of the witness's proposed testimony which specifies the issue(s) to which the testimony will be directed together with an estimation of the length of time it will take to present the party's case."

[¶69]   The Rural Companies pre-hearing report offered a summary of Mr. Jackson's oral testimony:

> [I]n addition to the matters set forth in his pre-filed testimony, Mr. Jackson may testify as to any of the factual or opinion assertions set forth in this document pertaining or related to the history of local exchange service prices, the history of legacy FUSF, the history of WUSF, HCL; HCL comparison to ACAM; Union's numbers and allocations historic and current as it relates to Analysis 8; Analysis 8 issues and problems; similar HCL proxy Analysis proposals issues and problems; attributes of the Rural Companies['] proposals which address allocation problems; as well as to address testimony set forth in Mr. Meredith's rebuttal testimony.

Union does not identify which "concepts and issues" came out during Mr. Jackson's oral testimony that it felt were new, and it is not evident from our review of the record what exactly Union considered to be "far outside of the scope of his pre-filed testimony."

[¶70]  Union seemingly objected to Mr. Jackson's testimony regarding Exhibits 301 through 314.  In response, the hearing examiner ruled that the testimony was proper

21

because it was based on the filed exhibits which were in the record. When Union pushed the issue, the hearing examiner conferred with PSC counsel and explained to the parties that "the [PSC's] expectation is that summary of the witnesses' pre[-]filed testimony will be closely related," but that "perfect adherence is not required." Thus, even if Mr. Jackson's oral testimony strayed somewhat beyond his pre-filed testimony, the PSC reasonably deemed it to be closely related. Because Union has not convinced us that this ruling was an abuse of discretion,[14] and we have found nothing in the Wyoming Administrative Procedure Act, the PSC's rules, or its orders that specifically limited oral testimony to what was pre-filed, we affirm the ruling.

[¶71]   Union's due process argument also must fail. Though Union is correct "that a party to a civil proceeding generally has a due process right to cross-examine witnesses," *Jontra Holdings Pty Ltd. v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 83, 479 P.3d 1222, 1245 (Wyo. 2021), Union does not explain how Mr. Jackson's oral testimony "prevented" it from cross-examining Mr. Jackson. The record shows that Union was given an opportunity to cross-examine Mr. Jackson but declined to do so. We find no due process violation.

### *CONCLUSION*

[¶72]   We conclude that collateral estoppel did not bar the PSC from adopting a WUSF calculation methodology that considered A-CAM funds to be FUSF contributions, and the PSC's 2021 order was lawful, in all respects, under the Wyoming Administrative Procedure Act § 16-3-114(c). Furthermore, the PSC did not abuse its discretion when it admitted the Rural Companies' Exhibits 301 through 314 and Mr. Jackson's testimony during the contested case hearing. For these reasons, we affirm the PSC's ruling.

---

[14] In regard to Union's reversible error assertion, the PSC's written order specifically found that even if it had excluded Mr. Jackson's testimony, the rest of the evidence of record was sufficient to support its adoption of Methodology 323. The record supports that finding. *See supra* ¶¶ 42–47 (substantial evidence discussion). Therefore, even if the PSC had erred in admitting Mr. Jackson's testimony, the error would have been harmless.